PRENTICE v. DULUTH STORAGE & FORWARDING CO. et al.

(Circuit Court of Appeals, Eighth Circuit. October 2, 1893.)

No. 252.

1. QUIETING TITLE—WHO MAY SUE—EJECTMENT SUITS.
   One or more owners of lots in severalty under a common source of title may maintain a bill for themselves and all others similarly situated who may become parties, to quiet title to real estate against an adverse claim alleged to be superior to the title of their common grantor, but repeatedly adjudged invalid in ejectment suits.

**2. SAME—VACANT LAND—STATE STATUTE—FEDERAL COURTS.**
A right given by state statutes to a claimant of vacant lands to sue to quiet title may be enforced in the federal courts.

**3. DEEDS—RULES OF CONSTRUCTION.**
In construing a deed the court may put itself in the place of the grantor for the purpose of discovering his intention, and then, in view of all the facts and circumstances surrounding him, consider how the terms of the deed may affect the subject-matter.

**4. SAME—INTENTION CONTROLLING.**
When the intention is manifest it will control in the construction of a deed without regard to technical rules of construction.

**5. SAME—DESCRIPTION—INDEFINITE INDIAN SELECTION.**
An Indian, entitled by treaty to select a section of land, made a declaration in writing that he selected a tract "one mile square, the exact boundary of which may be defined when the surveys are made, lying on the west shore of St. Louis bay, Minnesota territory, immediately above and adjoining Minnesota point;" Minnesota point being a well-known landmark. *Held,* that this selection was too indefinite to form the basis for a conveyance of any specific land. Prentice v. Railroad Co., 43 Fed. Rep. 274, followed.

**6. SAME—SPECIFIC DESCRIPTION—FLOATING RIGHT.**
A deed which refers to an indefinite Indian selection of a tract of land under a treaty as the basis of title, but which describes specific land by definite boundaries, the same appearing from a contemporaneous contract to be the exact land intended to be conveyed, cannot be construed to transfer a floating right to any interest the Indian might acquire under the treaty, so as to cover other lands, not included in the specific description, which were subsequently set off to the Indian in lieu of his selection. 50 Fed. Rep. 878, affirmed.

**7. SAME—RECORDING—DEEDS MADE IN OTHER STATES.**
A deed of lands in Minnesota territory, executed before a magistrate of another state, but not certified by the clerk of the county court of such state to be "executed and acknowledged according to the laws" thereof, as required in such case by the Minnesota statute, (Rev. St. Minn. 1851, c. 46, § 9,) was not entitled to record in Minnesota, and hence, although copied into the record book, was not recorded according to law. Lowry v. Harris, 12 Minn. 255, (Gil. 166,) followed.

**8. SAME—INVALID RECORD—CONSTRUCTIVE NOTICE.**
The record of a deed is not constructive notice of its contents when it is not entitled to be recorded under the registry statutes. Parret v. Shaubhut, 5 Minn. 323, (Gil. 258,) followed.

**9. SAME—BONA FIDE PURCHASERS—GRANTEES BY QUITCLAIM.**
One who, prior to the statute of Minnesota of 1875, acquired title to Minnesota lands by a quitclaim deed purporting to convey the lands themselves, was entitled to the benefit of the rule in favor of innocent purchasers for value, although it was held by the supreme court of Minnesota, up to that time, that a grantee under a quitclaim in common form could not be considered an innocent purchaser without notice, the common form being a release of all the grantor's "right, title, and interest" in the lands.

Appeal from the Circuit Court of the United States for the District of Minnesota.

In Equity. Suit by the Duluth Storage & Forwarding Company and the Duluth Street-Railway Company, for themselves and for all others similarly situated who might become parties, against Frederick Prentice, to quiet title to lands. There was a decree for complainants in the court below, (50 Fed. Rep. 878,) and defendant appeals. Affirmed.

Statement by SANBORN, Circuit Judge:

This is an appeal from a decree quieting the title to certain lots in the city of Duluth, Minn., in the appellees, and enjoining the appellant from asserting his adverse title.

The treaty of September 30, 1854, which was approved January 29, 1855, between the United States and the Chippewa Indians of Lake Superior and Mississippi river, contained this stipulation: "It is agreed that the chief Buffalo may select one section of land at such place in the ceded territory as he may see fit, which shall be reserved for that purpose and conveyed by the United States to such person or persons as he may direct." Immediately after the treaty was signed, and on the same day, Chief Buffalo signed a written instrument, which, after reciting this clause of the treaty, contains the following declaration: "I hereby select a tract of land one mile square, the exact boundary of which may be defined when the surveys are made, lying on the west shore of St. Louis bay, Minnesota territory, immediately above and adjoining Minnesota point; and I direct that patents be issued for the same according to the above recited provision to Shaw-Bwaw-Skung or Benjamin G. Armstrong, my adopted son; to Matthew May-Dway-Gon, my nephew; to Joseph May-Dway-Gon and Antoine May-Dway-Gon, his sons, one quarter section to each."

This instrument was deposited in the office of the commissioner of Indian affairs, February 20, 1856. On September 17, 1855, the other beneficiaries under this instrument conveyed all their right, title, and interest therein or thereunder to Benjamin G. Armstrong, and directed that all patents for lands to which they might have been entitled according to the directions of Chief Buffalo should issue to him. On September 11, 1856, Armstrong and his wife made a deed to the appellant of the undivided half of a tract of land described thus: "Beginning at a large stone or rock at the head of St. Louis river bay, nearly adjoining Minnesota point; commencing at said rock and running east one mile, north one mile, west one mile, south one mile, to the place of beginning, and being the land set off to the Indian chief Buffalo at the Indian treaty of September 30, A. D. 1854, and was afterwards disposed of by said Buffalo to said Armstrong, and is now recorded with the government documents."

The deed was executed in the state of Wisconsin. It was acknowledged before a justice of the peace. The statutes of Minnesota territory required a deed thus executed to have attached to it a certificate of the clerk or other proper certifying officer of a court of record of the county or district where the deed was executed that it was executed and acknowledged according to the laws of the state in which it was executed, in order to entitle it to record. Rev. St. Minn. 1851, c. 46, §§ 8–10, 23. This deed had no such certificate, but it was recorded in the office of the register of deeds of St. Louis county, November 4, 1856. On the day the deed was made, the appellant, Prentice, made a written agreement with Armstrong that in consideration of this deed he would furnish the latter what money or provisions might be necessary to enable him to go upon and erect a house on this land, to furnish what provisions should be necessary for his family while he was employed on the land, to take the general supervision of the whole tract, to pay all expenses of litigation about, and to do all in his power to perfect, the title of said land, and, when the title should be perfected, to get the land platted, and assist Armstrong in selling his interest. Armstrong agreed on his part to remove into the house and reside there as long as should be required to make such improvements as they thought necessary. This contract contains the same description found in the deed. Armstrong never built the house or resided on the land, and there was a substantial failure of both parties to do anything concerning the land or its title in accordance with this contract.

That portion of the description in the deed which gives the metes and bounds was written by the scrivener at the dictation of Armstrong, and the remainder of it at the dictation of the appellant. The rock mentioned in this description is well identified. It stood near the west shore of St. Louis bay, a short distance southwesterly from the base of Minnesota point, and was a well-known landmark. The mainland at the base of Minnesota point rises rapidly for the distance of a mile. The mile square bounded by the courses and distances given in the deed would extend across the base of

Minnesota point and "adjoin" it, but it would not cover any of the lots here in dispute, or any of the land subsequently patented to the beneficiaries under the treaty, and nearly one-half of it would be under the waters of Lake Superior. If the first course read west and the third course east in this description, a mile square would be described which would not "adjoin" Minnesota point, which would depart from the shore of the bay except at one corner, but which would cover about half the land subsequently patented to the beneficiaries, and the lots involved in this suit. All these lands were situated in St. Louis county, Minnesota territory, and Armstrong had no interest in any other land than that to which he was entitled under the treaty when he made this deed. He then supposed the mile square specifically described in his deed was the section Buffalo had selected. The government survey of these lands was not then made, and, when made in 1857, the surveyed lines did not correspond with the courses named in this deed, and the lands adjoining Minnesota point and extending up the hill from it were claimed by traders who were in possession of them. Thereupon the officers of the department of the interior selected 662.62 acres of land in four tracts adjoining each other, and all lying east, and within two miles, of a north and south line passing over the rock. These tracts did not form a mile square in compact form, and none of them adjoined Minnesota point, but on October 23, 1858, the United States issued patents to these four tracts in severalty to the four beneficiaries named by Chief Buffalo in satisfaction of the treaty stipulation.

On March 13, 1859, the patentees of these lands, other than Armstrong, executed deeds of conveyance of the lands respectively patented to them to Charlotte Armstrong, the wife of Benjamin G. Armstrong, and these deeds were recorded in St. Louis county, May 17, 1859. On October 22, 1859, Armstrong and his wife conveyed an undivided half of all these lands to Daniel S. Cash and James H. Kelly, by warranty deed. On August 31, 1864, Armstrong and his wife "remised, released, and quitclaimed" the undivided half of all these lands to John M. Gilman by a deed which was duly recorded in St. Louis county, September 12, 1864. Mr. Gilman paid a valuable consideration for this conveyance, and had no actual notice of the deed to appellant, or that he claimed any of this land, until 1870. The appellees are immediate or remote grantees of Mr. Gilman. Their lots are either occupied by them, respectively, or are vacant, and they are not held by them jointly, but in severalty. The lands described in the deed to Mr. Gilman are in the city of Duluth. More than 500 buildings, including railroad depots, hotels, wholesale houses, and residences, stood upon this land when this action was commenced. The appellant was never in possession of any of this land, never demanded possession of any of it until 1883, and never paid any taxes upon it. On August 27, 1872, Armstrong and wife assigned and quitclaimed all their right, title, and interest in these lands to the appellant. In 1883 he brought an action of ejectment for the undivided half of part of these lands which were held by the defendants in that action under the deed to Mr. Gilman, and after a trial of the merits Mr. Justice Miller ordered judgment for the defendants. Prentice v. Stearns, 20 Fed. Rep. 819. This judgment was affirmed by the supreme court in 1885. 113 U. S. 435, 5 Sup. Ct. Rep. 547. In 1890 another action of ejectment for another portion of these lands held under the same title was tried before Mr. Justice Miller with the same result. Prentice v. Railroad Co., 43 Fed. Rep. 270.

In 1890, two of the appellees filed the bill in this case on behalf of themselves and all others similarly situated who should become parties to the suit to quiet the title of their common grantor, Mr. Gilman, to the lots the appellees held, and to enjoin the appellant from prosecuting any claim to said lots by suit or otherwise. The bill alleged the jurisdictional facts, the title of Mr. Gilman to the undivided half of the 662.62 acres, and that the appellees had succeeded to his title to certain lots which are a part of those lands, and that they held these lots in severalty. It also set forth the deed to the appellant, alleged that none of the lands conveyed to Mr. Gilman were described in that deed, but that the appellant claimed to be the owner of the undivided half of them under it; that he had never taken possession of any

of the lands, and that they were all in the possession of those claiming under Mr. Gilman, or vacant and unoccupied. The bill then set forth the actions of ejectment the appellant had brought, and that he threatened to bring a large number of separate actions against different persons claiming to own lots in severalty under the Gilman deed. After the commencement of this suit more than 500 persons similarly situated to the complainants became parties complainant. The defendant demurred to the bill, and his demurrer was overruled. The suit was heard on the merits, and a decree for complainants entered.

Emanuel Cohen, (Stanley R. Kitchel, Frank W. Shaw, John F. Dillon, Elihu Root, and Samuel B. Clarke, on the brief,) for appellant.

William W. Billson and George B. Young, for appellees.

Before CALDWELL and SANBORN, Circuit Judges, and THAYER, District Judge.

SANBORN, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

That this suit was well and wisely brought admits of no discussion. Owners of lots in severalty in possession under a common source of title may join in a bill of peace to quiet their title and to enjoin the prosecution of an adverse claim repeatedly adjudged invalid in suits in ejectment, the validity of which depends entirely upon the superiority of the title of their common grantor. The law and the facts which determine the validity of the title of one such owner also determine the validity of the title of every such owner. While they are owners in severalty, they are united in interest in the sole question at issue in such a case,—the validity of the title of their common grantor. A suit based upon such a bill is of general equitable cognizance. It prevents a multiplicity of suits, and affords the only adequate remedy for such a multitude of several owners as occupy the heart of a great city when their common source of title is assailed. Osborne v. Railroad Co., 43 Fed. Rep. 824; Crews v. Burcham, 1 Black, 352, 358.

The objection that some of the lots in controversy are not in the possession of any of the complainants, but are vacant and unoccupied, is without merit. The statutes of Minnesota provide that any person in possession of real property, and any person claiming title to vacant and unoccupied real estate, may alike bring a suit against any person claiming an adverse estate or interest therein, for the purpose of determining such adverse claim, and the rights of the parties respectively. Gen. St. Minn. 1878, c. 75, § 2. These statutes also provide that whenever two or more persons claim lots or tracts of land in severalty under conveyances from the same grantor as the common source of title, and a claim of title thereto is made by any one as against the title of such grantor, any one claiming under such grantor may bring an action on behalf of himself and all others who may come in and become parties to such action against the person claiming adversely to have the title of such grantor quieted as to the real estate claimed by the complainant and those who become parties to the action; and that any person who claims title under the common grantor, and whose title

is controverted by the same defendant upon the same ground as that of the complainant, may come in as of course, and become a party in such action, by filing a statement of these facts. Id. § 4. If a bill of peace by one out of possession to quiet a title that had never been adjudicated in an action at law to which he was a party could not have been maintained in the federal court before the enactment of these statutes, then they create a right to a valuable remedy which the complainants might avail themselves of in that court. Rights created by state statutes may be enforced in the federal courts when those statutes prescribe methods of procedure which by their terms are to be pursued in the state courts of original jurisdiction, and there is nothing of a substantive character in the methods prescribed which makes it impossible for the federal courts to substantially follow those methods. Clark v. Smith, 13 Pet. 195, 203; Fitch v. Creighton, 24 How. 159; Stark v. Starrs, 6 Wall. 402, 410; Holland v. Challen, 110 U. S. 15, 3 Sup. Ct. Rep. 495; Railway Co. v. Whitton, 13 Wall. 270, 286; Reynolds v. Bank, 112 U. S. 405, 5 Sup. Ct. Rep. 213; Ex parte McNiel, 13 Wall. 236, 243.

The assignment of error chiefly relied on by the appellant, however, is that the court below decreed that the deed from Armstrong and wife to the defendant, Prentice, describes, and was intended to describe, a defined tract of land no part of which is included in any of the lands described in the pleadings of the complainants herein, and that it was not operative to affect the title to any of said lands. The treaty vesting in Chief Buffalo the right to select a section of land to be conveyed to his appointees was approved January 29, 1855. The deed in question from Armstrong and his wife to Prentice was made September 11, 1856, before the government surveys had been made, and it described the property conveyed as the undivided half of a tract of land—

"Beginning at a large stone or rock at the head of St. Louis river bay, nearly adjoining Minnesota point; commencing at said rock and running east one mile, north one mile, west one mile, south one mile, to the place of beginning, and being the land set off to the Indian chief Buffalo at the Indian treaty of September 30, A. D. 1854, and was afterwards disposed of by said Buffalo to said Armstrong, and is now recorded with the government documents."

At the time this deed was made there was no tract set off to Buffalo, and no description among the government documents describing this land, other than the treaty and Buffalo's declaration in these words:

"I hereby select a tract of land one mile square, the exact boundary of which may be defined when the surveys are made, lying on the west shore of St. Louis bay, Minnesota territory, immediately above and adjoining Minnesota point."

The rock referred to in the deed is identified as a well-known landmark, and it is conceded that the tract described in the deed by metes and bounds does not include any of the lands here in question, but appellant contends—First, that the effect of this deed was to convey one-half of all the rights Armstrong then had or might thereafter acquire to any land under the treaty and under

Buffalo's appointment; and, second, that if this position is not sustained, the court should find that by mistake the first course in the description reads east when it should read west, and the third course west when it should read east, and that it should by construction so change these courses and thus reach the land of the appellees.

The first contention rests upon the proposition that a deed should be made operative if possible, and that a liberal construction should be adopted to effect that object, and to enforce the original design. It is supported by the facts that Armstrong owned no interest in any other land than that which he was entitled to under this treaty; that about one-third of the square mile described by metes and bounds was covered by the waters of Lake Superior; that he must have known that the boundary lines of his claim were subject to readjustment; that the deed was not made in view of the lands or upon the marking of any monument, and that the clause of the deed which follows the description by metes and bounds expressly states the land conveyed to be that set off to Chief Buffalo under the treaty. Upon these facts it is forcibly argued that Armstrong must have intended to convey half his right to any land he might be or become entitled to under the treaty, wherever situated, and whenever patented, and not merely the square mile he bounded.

The rules applicable to the construction of deeds have been collected in the briefs of counsel with commendable industry, but, in the view we take of the evidence presented by this record, it will be necessary to apply but two of them to the facts here presented, and these are (1) that the court may place itself in the place of the grantor for the purpose of discovering his intention, and then, in view of all the facts and circumstances surrounding him at the time of the execution of the instrument, consider how the terms of the deed may affect the subject-matter; and (2) that when the intention is manifest it will control in the construction of the deed without regard to technical rules of construction. Witt v. Railway Co., 38 Minn. 122, 127, 35 N. W. Rep. 862; Driscoll v. Green, 59 N. H. 101; Johnson v. Simpson, 36 N. H. 91; Walsh v. Hill, 38 Cal. 481, 486, 487.

We proceed to apply these rules. On September 11, 1856, Armstrong was the sole beneficiary under the reservation of the section in the treaty for the appointees of Chief Buffalo. He was poor and without influence. Prentice was wealthy and influential. The tract selected by Chief Buffalo was undefined and undefinable from the memorandum he had made. It was somewhere on the western shore of St. Louis bay, above and immediately adjoining Minnesota point. On this point there was quite a settlement. The mainland rose rapidly for the distance of a mile northwest from the base of the point, and this land was frequently spoken of as above the point. On this land, just above and adjoining the point, George E. Nettleton and his brother William had cleared the land, and established a trading post. The shore of the bay and of the lake extended from the southwest to the northeast, and Minnesota point divided the bay from the lake. About 500 feet southwest of

Minnesota point, on the shore of the bay, was the large rock, 40 feet square, referred to in the deed. It was a well-known landmark, an altar on which the Indians sacrificed to their deity, and at the base of which they landed from their canoes. Near the base of the point was the "little portage" where they landed and carried their canoes across Minnesota point when they were traveling from the lake to the bay or from the bay to the lake. The rock, this portage northeast of it, and Minnesota point itself, were undoubtedly familiar objects to Chief Buffalo when he made his memorandum of selection, and it seems probable that the land he intended to describe was a mile square lying along the shore of the bay and across the base of this point, extending back up the hill, and being in that manner immediately adjoining and above the point. His attempted selection is, however, clearly too indefinite and uncertain to form the basis of any conveyance of specific land, and for that reason the second clause of the description in the deed must be held to be void as an independent or cumulative description, as declared by Mr. Justice Miller in Prentice v. Railroad Co., 43 Fed. Rep. 274. Its only effect was, to make a reference to the title under which the mile square was claimed, unless in connection with the first clause in the deed it can be construed to effect a conveyance of one-half of all the rights Armstrong had under the treaty.

We proceed with the consideration of that question. The great rock was universally reputed among the few settlers about Minnesota point to be the southwest corner of the Buffalo tract. Armstrong had repeatedly declared it to be so, and he supposed when he made the deed that the tract described by metes and bounds was the section selected by Buffalo under the treaty. The southwest corner of this tract was on the St. Louis river bay. It extended across the base of, and immediately adjoined, Minnesota point, and extended up the hill directly above it. But the Nettletons claimed a portion of this section. Litigation with them would probably result from pressing any claim to it, and Armstrong had neither the ability nor the means to conduct it. Under these circumstances he made this deed to Mr. Prentice of an undivided half of the square mile he claimed, including therein the lands and improvements of the Nettletons, and agreed to build a house upon and live on this land. He described the land by a natural and well-known landmark and by courses and distances that make it unmistakable. In consideration of this deed Mr. Prentice agreed to pay the expenses of building the house, to furnish the necessary supplies for Armstrong's family while they lived on the land, to take charge of the whole tract, to pay all the expenses of the expected litigation with the Nettletons, and do all things proper to perfect the title to this land, and, when it was perfected, to plat it, and assist Armstrong to sell his remaining half. This agreement was written and signed by the parties on the day the deed was executed. It contains the same description as the deed, and was a part of the transaction in which the deed was executed. When this suit was tried in the court below that court had held in two cases that had been previ-

ously tried, in which this contemporaneous contract was not produced, that the description contained in this deed covered only the specific tract of land bounded in it by courses and distances, and that it did not convey one-half of all Armstrong's rights under the treaty. Prentice v. Stearns, 20 Fed. Rep. 819; Prentice v. Railroad Co., 43 Fed. Rep. 270. In the former case the court found the fact to be that the tract selected by Buffalo extended northeasterly of the rock, and embraced that part of the section bounded in this deed not covered by water, and that it did not cover any of the lands patented to the relatives of Chief Buffalo, and on that finding its decision was affirmed by the supreme court in Prentice v. Stearns, 113 U. S. 435, 5 Sup. Ct. Rep. 547. In the latter case it found the fact to be that Buffalo's selection extended southerly from the rock and covered some of the lands subsequently patented to these relatives, and none of the lands bounded in the deed. It is no longer material to determine whether or not either of these findings was correct. The production of the contemporaneous contract, in our view, concludes this discussion, and renders the determination of this question unimportant. In its absence the court below and the supreme court construed this deed to convey no right or interest of Armstrong in any other land than that specifically bounded in the first clause of the description. That construction seems to us to be warranted without reference to the contract under the evidence in this case, for the reasons stated in the opinions in the cases referred to. But an examination of this contemporaneous agreement demonstrates the correctness of that construction. It was not upon a floating right to some unknown land that Armstrong was to erect his house and live. It was upon this specific tract, one mile square, whose southwest corner was the well-known rock. It was not the title to a right to some land under the treaty somewhere that Prentice was to litigate and perfect, (for no one disputed that right,) but it was the title to the specific square mile bounded in the deed and contract that he was to litigate with the Nettletons and establish. It was not a floating right to some unknown land that he was to plat, but this specific square mile at the base of Minnesota point. If Mr. Prentice had performed his agreement, if he had litigated and perfected the title to this land, his deed would have been effective and valuable; and it is plain from the terms of this contract that it was the intention of the parties that it should be valid on that condition, and on that condition only. He failed to perform it. He did not litigate the title with the Nettletons. He did not perfect the title to the land. He abandoned his deed and his contract for 15 years, and Armstrong abandoned the land to the other claimants. The United States so far disregarded the attempted selection of Chief Buffalo that it patented to his appointees, and they received, in satisfaction of the treaty, lands that are not above and immediately adjoining Minnesota point. Armstrong conveyed these lands to third parties, and neither he nor Mr. Prentice seems to have thought of their abandoned deed until 14 years after these patents were issued.

Under these circumstances it is not doubtful that this deed does

not describe or convey, and that it was never intended to describe or convey, anything more than the square mile bounded by the first clause of the description.

In regard to the second position urged upon us by the appellant,—that the first clause in the description should be so construed that the first course should read east and the third west,—it is sufficient to say that there is no evidence in this case that either the grantor who dictated this description or the scrivener who wrote it did not respectively dictate and write just what they intended. There is no evidence of any mistake, nor is the grantee, Prentice, who failed to perform the agreement which was the consideration of the deed, in a position to ask a court of equity to correct such a mistake if there was one.

The result is that there was no error in the decree of the court that the description in this deed to Mr. Prentice, construed in the light of the surrounding circumstances at the time the deed was made, and of the contemporaneous contract made on that day, did not cover or describe any of the lands claimed by the complainants or any right of the grantor, Armstrong, to any other land than the square mile specifically bounded in the first clause of its description.

Moreover, if the deed to appellant had contained a sufficient description to convey one-half of Armstrong's right to the land subsequently patented to the relatives of Buffalo, it could not prevail over the title of Mr. Gilman. At the time this deed and the subsequent deed to Mr. Gilman were executed the statutes of Minnesota provided:

First. That any deed executed in any other state, territory, or district of the United States "may be executed according to the laws of such state, territory or district." Rev. St. Minn. 1851, c. 46, § 9; Pub. St. 1858, c. 35, § 9.

Second. That in cases where deeds are executed in any other state, territory, or district, unless the acknowledgment is taken before a commissioner appointed by the governor of the territory for that purpose, such deeds shall have attached thereto a certificate of the clerk or other certifying officer of a court of record "that the deed is executed and acknowledged according to the laws of such state, territory or district." Id. § 10.

Third. That to entitle any deed to record it must have "a certificate of acknowledgment * * * as provided in this chapter, and in cases where the same is necessary, the certificate required by the tenth section of this chapter." Id. § 23.

Fourth. That "every conveyance of real estate within this territory hereafter made, which shall not be recorded as provided by law shall be void as against any subsequent purchaser, in good faith and for a valuable consideration, of the same real estate, or any portion thereof, whose conveyance was first duly recorded." Id. § 24.

The deed to the appellant was executed in Wisconsin, and acknowledged before a justice of the peace in that state. There was attached to it the certificate of the clerk of the county court, but this certificate failed to state that the deed was "executed and acknowledged according to the laws of Wisconsin." Under the con-

struction given to these statutes by the highest judicial tribunal of the state of Minnesota, which is a rule of property in that state, and which the federal courts are bound to follow, this deed was not entitled to record, and hence was not "recorded as provided by law." Lowry v. Harris, 12 Minn. 255, (Gil. 166.)  See, also, Morton v. Smith, 2 Dill. 316, 319; O'Brien v. Gaslin, 20 Neb. 347, 30 N. W. Rep. 274; Greenwood v. Jenswold, 69 Iowa, 53, 28 N. W. Rep. 433; Ely v. Wilcox, 20 Wis. 551, 556; Fisher v. Vaughn, 75 Wis. 609, 615, 44 N. W. Rep. 831, 833.

Mr. Gilman had no actual notice of the record of this deed before he paid for the land, and, as the deed was not entitled to record, the record of it was not constructive notice of its contents, or of any claim of the appellant under it.  Parret v. Shaubhut, 5 Minn. 323, (Gil. 258, 261;) Cogan v. Cook, 22 Minn. 137, 143; Carpenter v. Dexter, 8 Wall. 513, 532, and cases cited.

He was a bona fide purchaser for value without actual notice of this deed or of any claim of Mr. Prentice under it to the lands described in the deed to himself.  The record of the Prentice deed was, as we have seen, no notice of that claim.  The deed of Mr. Gilman was duly executed and acknowledged, and was duly recorded in 1864.  And under the provisions of section 24, supra, the deed to Mr. Prentice, even if it had described this property, would have been void as against Mr. Gilman, as a subsequent purchaser in good faith and for a valuable consideration, whose conveyance was first duly recorded.

In reaching this conclusion we have not overlooked the fact that in 1864, and until the course of decision was changed by statute in 1875, it was the settled rule in Minnesota that one claiming title by a quitclaim deed in the form in common use in that state could not to be regarded as a bona fide purchaser without notice.  Martin v. Brown, 4 Minn. 282, (Gil. 201;) Hope v. Stone, 10 Minn. 141, (Gil. 114;) Everest v. Ferris, 16 Minn. 26, (Gil. 14;) Marshall v. Roberts, 18 Minn. 405, (Gil. 365.)  The same rule prevailed in the supreme court for many years, but has lately been abolished by that court, and declared to rest upon no sound reason.  Moelle v. Sherwood, 148 U. S. 21, 13 Sup. Ct. Rep. 426; U. S. v. California, etc., Land Co., 148 U. S. 31, 41, 13 Sup. Ct. Rep. 458.  The rule which prevailed in Minnesota in 1864 must, however, govern in this case if it is fairly applicable; but, in view of the fact that it has since been abrogated by the state and by the nation, it ought not to be applied to cases not clearly within it.  When this rule was established the statutes of Minnesota provided that "a deed of quitclaim and release, in the form in common use, shall be sufficient to pass all the estate which the grantor could lawfully convey by deed of bargain and sale." Pub. St. Minn. 1858, c. 35, § 3.  The deed of quitclaim and release in the form in common use was a conveyance of all the grantor's "right, title, and interest" in the land described in the deed.  It was not a conveyance, quitclaim, or release of the land itself.  An examination of the Minnesota cases that establish this rule discloses the fact that all the deeds under consideration in those cases were of this form.  The argument upon which the rule was first estab-

lished was: The deed to the subsequent purchaser does not purport to convey the land, but only the interest the grantor has in the land, and "when, therefore, a person relies on a mere quitclaim of the interest which a party may have in property, he does so at his peril, and must see to it that there is an interest to convey. He is presumed to know what he is purchasing, and takes his own risk." Chief Justice Emmett in Martin v. Brown, 4 Minn. 282, (Gil. 201.) In Marshall v. Roberts, 18 Minn. 409, (Gil. 365,) where the subsequent purchaser under such a deed sought to take advantage of that provision of the recording act which declares a prior unrecorded deed void as against any subsequent bona fide purchaser for value of the same real estate who first records his deed, the court said:

"It is only the purchaser of the same real estate, or any portion thereof, who by his priority of record cuts out the title of a prior purchaser; for when the second purchaser obtains by his quitclaim deed only what his grantor had (his grantor's right, title, and interest) at the time when such deed was made, he is not a purchaser of the same real estate (or any part thereof) which his grantor had previously conveyed away, and therefore no longer has."

The deed to Mr. Gilman is not a quitclaim deed of the form in common use in Minnesota. It is not a conveyance of the "right, title, and interest" of the grantor, but a conveyance of the land itself. The purchaser under such a deed is a purchaser of the same real estate previously conveyed by his grantor by the same description. The supreme court of Minnesota has never applied this rule to a purchaser under such a deed. The reasoning on which that rule rests has, in our opinion, no application to it, and we are constrained to hold that Mr. Gilman and his grantees are entitled to the benefit of the registry statute under this deed.

We have carefully examined the assignments of error relative to the admission of the evidence, and think there was no error in this regard in the rulings of the court below. These assignments are unimportant, and do not require a more extended notice.

The decree below is affirmed, with costs.