### GUNN v. BLACK et al.

### BLACK et al. v. GUNN.

#### (Circuit Court of Appeals, Eighth Circuit. January 29, 1894.)

#### Nos. 277 and 278.

1. ACCOUNTING—OBJECTIONS TO MASTER'S REPORT—WAIVER.

Where an order directing an accounting states the principle to be followed, and no objection is made thereto until after final decree, four years later,—the opposite party having died in the mean time,—it is then too late to contend, for the first time, that certain matters plainly excluded by the order ought to have been taken into consideration.

2. APPEAL—REVIEW—ACCOUNTING.

A reviewing court will not, on an accounting between partners, reverse the action of the court below in disallowing, on conflicting evidence, certain claims which were first presented on exceptions to the master's report, when the consideration of such claims was necessarily excluded by the order under which the accounting was conducted, and when the opposite party and one of the bookkeepers having knowledge of the matters had died in the mean time.

3. PARTNERSHIP—DISSOLUTION—SALE OF PROPERTY BY RESIDENT PARTNER—TRUSTS.

A resident managing partner, who is charged with the duty of winding up the partnership affairs and selling its property, is the agent and trustee of his nonresident copartner; and it is a breach of trust for him to become interested as a purchaser of such property, either alone or with others, without his partner's knowledge, or to make profits out of the property at his partner's expense, and by so doing he renders himself liable to account for the full value of the property at the time of the sale.

4. SAME—CONVEYANCE OF PARTNERSHIP INTEREST—EFFECT.

A deed whereby a partner owning a two-thirds interest in the partnership conveys to his copartner an "equal interest" in all the property of the firm will not, in the absence of a special provision to that effect, operate as a release of the accounts of the firm, against the partners, respectively; but these, like other accounts, remain part of the firm property.

Appeals from the Circuit Court of the United States for the Eastern District of Arkansas.

These are cross appeals from a decree settling an account between partners. March 1, 1870, John Gunn, William Black, and Thomas Moffet formed a partnership under the name of John Gunn & Co., for the purpose of carrying on the sawmill business in Monroe county, Ark. August 3, 1872, Gunn purchased the interest of Moffet in the property of the partnership, and the two remaining partners continued the business of the firm. January 28, 1882, by a deed of that date, Gunn made Black an equal partner with himself in the property of the firm. The principal place of business of this partnership was at Brinkley, in Monroe county, Ark., where its mill was located. The account books of the partnership were kept there. Black

resided there, and took a more active part in the management of the business than did Gunn, who lived in Memphis, Tenn.  The original articles of copartnership provided that Gunn should give no more attention to the business than he should deem proper, but that Black should give his personal attention to the management of the workmen, and to the mill, and to whatever business should be transacted thereat.  These provisions appear to have been kept in mind, and complied with, through the entire existence of the firm.  The partnership was engaged in active business as such until 1882, when it had accumulated property worth at least $150,000.  Subsequent to that year, the partners were engaged in selling the property of the firm, and in winding up the affairs of the partnership; but as most of the property was in Monroe county, Ark., where Black resided, he conducted the business of selling it, and of winding up the partnership affairs, as he had before conducted the active business of the firm in that county.  October 3, 1888, Gunn commenced this suit against Black to dissolve the partnership, and to settle the accounts between the partners.  September 16, 1889, the special master who had been appointed by the court to state the accounts of the partners filed his report.  A few days later, Black died intestate, and this suit was revived against his administratrix, widow, and heirs at law, who, for convenience, will hereafter be called the defendants.  The complainant filed many exceptions to the master's report, and October 27, 1890, filed an amended complaint.  December 14, 1892, the final decree was rendered, from which both parties have appealed.

George Gillham, for complainant, Gunn.

John J. Hornor and M. L. Stephenson, (Jacob Trieber, on the brief,) for defendants.

Before SANBORN, Circuit Judge, and THAYER, District Judge.

SANBORN, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

The first supposed error assigned by the complainant cannot be sustained.  It is that the master did not charge Black, as managing partner of the firm, with all of the money and property that went into his possession, and credit him only with his proper disbursements, but stated an account between the firm and each of the partners, in the usual form.  While Black was the active manager of the business of this partnership at Brinkley, where the mill was situated, the record in this case clearly discloses the fact that during several years of its existence the complainant collected at Memphis, where he lived, large amounts of moneys of the firm, conducted its business with banks in that city, and generally received and disbursed as much, if not more, of the funds of the firm, than did his partner, Black.  Moreover, the account books of the partnership were kept in the same manner in which the master has stated these accounts, and the order appointing him directed him "to state the separate account of the plaintiff and defendant as the same appears from the books, and report the same to the court."

Nor was it error for the court to direct the master to state these accounts from the books alone, and to report this statement to the court.  This order was made October 26, 1888, shortly after the commencement of the suit; and no objection to it, no motion to recommit the case to the master for a further accounting, no complaint concerning it, was made, until it was assigned as error after the final decree in 1892.  It was then too late for the complainant

to object, if there had been error, and there certainly was not.   A master in chancery is an officer appointed by the court to assist it in obtaining information requisite to its decision.   He is usually appointed to take and report testimony, to state accounts, to compute interest, to ascertain the value of annuities, to report the amount of damages in particular cases, or to perform like duties.   His report, when made, is merely advisory.   The court may confirm, modify, or reject it, and must itself decide the issues presented in the case.   It cannot refuse to perform its duty to determine by its own judgment the controversy before it, nor can it delegate the performance of that duty to any of its officers, without the consent of the parties.   It follows that it is entirely in the discretion of the court to determine, subject to the rules of evidence, the extent and character of the information the master it appoints shall obtain and report for its guidance.   Kimberly v. Arms, 129 U. S. 512, 523, 9 Sup. Ct. 355.

Three hundred and eighty-nine vouchers for amounts aggregating about $100,000 were produced by complainant, from which, and the evidence accompanying them, it appeared that he had paid about this amount on account of the debts of the partnership, and that he had never received credit for any of it on the account books of his firm, or on the master's report.   The court below refused to allow him any part of this amount, and this ruling is repeatedly assigned as error, and is the principal ground of complaint.   Most of these vouchers appear to have been made, and the amounts they represent appear to have been paid, in the years 1872, 1873, 1874, and 1875.   During those years, Black was running the sawmill at Brinkley, and selling and shipping lumber to various parties, on account of the firm.   Many of these customers resided in Memphis, and the bills of the firm against them were collected in that city.   Some of these bills were collected by the complainant, and in that way he received moneys of the firm which should be charged against him, if he is to be credited with the amount of these vouchers.   He admits in his own testimony that he should be charged with $19,531.82 that does not appear against him on the books or in the master's report.   On these books are still found accounts against customers of the firm, who were solvent, aggregating many thousands of dollars, which were, in all probability, paid to some one; but no payment has ever been credited on the books, nor has the amount paid been charged to any one. Who collected these accounts?   The cash received by this firm, according to its books, for the 29 months ending August 1, 1872, averaged $2,223.31 per month.   The cash received by the firm, according to these books, for the 36 months commencing August 1, 1875, averaged $4,321.08 per month.   But the cash received by this firm, according to these books, for the 36 months intervening between August 1, 1872, and August 1, 1875, averaged only $575.09 per month.   This was the period during which the complainant paid most of the amounts he presents these vouchers for; and if the firm business was increasing during these years, as its subsequent record strongly indicates, this cash account is very persua-

sive evidence that some one must have collected for the firm a very large portion, if not all, of the money expended for these vouchers. If the business yielded a monthly income in amount halfway between the average of the 29 months before and that of the 36 months after this period, it would have produced $96,893.60 more in these three years than it is credited with on the books of the firm. Joseph Tomlinson was bookkeeper of the firm at Brinkley from January, 1873, until January 1, 1880. R. B. Davis, the special master who stated the account in the court below, was the bookkeeper of the firm from January 1, 1880, until May 1, 1886. J. M. Folkes was the bookkeeper of the firm from April 1, 1887, until this suit was commenced. About the year 1885 the complainant learned that the amounts he had paid upon some of these vouchers had not been credited to him on the books; and thereupon, in that year, at the suggestion of himself and Black, the two bookkeepers, Tomlinson and Davis, who had some, if not all, of these vouchers, prepared lists of the debits and credits which each of the partners was entitled to as against the firm, for the purpose of enabling them to settle their accounts with each other. In the list of credits to the complainant thus prepared, the amounts evidenced by most of these vouchers appeared, and yet the difference between the balances due the firm from the two partners was less than $5,000, according to these lists. No settlement was effected, and in 1887 the bookkeepers Davis and Folkes, who had some if not all of these vouchers, prepared lists of the debits and credits of each of these partners as against the firm, in like manner. The list of credits to the complainant which these bookkeepers made contains many of the amounts evidenced by these vouchers, and yet the difference between the balances due the firm by these partners in 1887 was less than $1,000, according to these lists. The master's report makes the difference between these balances in 1889 $3,953.21. If the amounts of these vouchers should now be credited to the complainant, after debiting him with the amount he admits he received, it would make it appear that the difference in the balances of the two partners was more than $75,000 during all the time after 1884. If this was the true state of the accounts, it is strange that none of these bookkeepers discovered it. Moreover, the bookkeeper Folkes testifies that a copy of the account he and Davis made in 1887 was sent to complainant; that the complainant discussed it with him, and objected to a few items, which did not amount to $5,000 in the aggregate. In the original complaint no special mention is made of the failure of the firm or of Black to credit the complainant with this large amount which does not appear on the books, although the complainant knew as early as 1885 that the amounts of these vouchers were not credited to him on the books. The order appointing the master on October 26, 1888, directed him to state the accounts according to the books, and no objection was made to this order until long after the death of Black, although it clearly excluded the vouchers from the consideration of the master. The master's report was filed September 16, 1889, and in that month Black died.

Joseph Tomlinson, the bookkeeper from 1872 to 1880, is also dead; and it was not until January 28, 1890, when he filed his exceptions to the master's report, that the complainant first asked for an allowance of the amounts evidenced by these vouchers. In view of these facts,—that the complainant received $19,531.82 of the moneys of the firm that were not charged to him on its account books; that he collected moneys of the firm in Memphis, deposited them in bank accounts which he used, and generally managed the financial affairs of the firm in that city during the years when most of these vouchers were made; that the cash which appears by the books to have been received by the firm at Brinkley during this period is nearly $100,000 less than the members of the firm must have collected if the business increased as the receipts before and after this period indicate that it did; that the bookkeepers of the firm (men who were most likely to have knowledge concerning these accounts) made two independent statements of them in different years, in which the complainant was given credit for most of these vouchers, and yet the state of the account between the partners shown by these statements is substantially the same as that found by the master; and the further fact that Black and the bookkeeper of the firm during this period were both dead before this claim was presented in this suit, and we are thus deprived of the explanations and countercharges they might have presented,—we are of the opinion that it would be extremely dangerous to now allow this large claim, and that this ruling of the circuit court ought not to be disturbed. Where the court below has considered conflicting evidence, and made its finding and decree thereon, they must be taken as presumptively correct; and unless an obvious error has intervened in the application of the law, or some serious or important mistake has been made in the consideration of the evidence, they must be permitted to stand. Warren v. Burt, 58 Fed. 101;[1] Tilghman v. Proctor, 125 U. S. 136, 8 Sup. Ct. 894; Kimberly v. Arms, 129 U. S. 512, 9 Sup. Ct. 355; Evans v. Bank, 141 U. S. 107, 11 Sup. Ct. 885; Furrer v. Ferris, 145 U. S. 132, 134, 12 Sup. Ct. 821.

The thirteenth error assigned is that the complainant was charged $500, December 17, 1881, as paid him by James Reilly; and it is sustained, because Mr. Reilly testifies, and the account books of the Brinkley Oil Company, of which he was president, show, that this amount was not paid to the complainant by Mr. Reilly, or the company of which he was president.

The sixteenth error assigned is that the complainant is not credited with several items, aggregating $1,280.84; and it is sustained, to the extent of $1,155.84, because it appears from the testimony of the bookkeeper Linsted that items aggregating that amount appear to the credit of the complainant on the partnership's books of original entry, which were not posted to the ledger, and hence were omitted from his credits in the master's report and in the decree.

[1] 7 C. C. A. 105.

The eighteenth error assigned is that Black should be charged with $2,223.30 more than he is charged with in the decree; and it is sustained, to the extent of $100, because the record discloses that an item of $131.95 charged to him on the books of original entry was posted as $31.95, and thus this $100 was not debited to him in the master's report or in the decree.

From 1882 until the commencement of this suit, the firm of Gunn & Black was selling its property and winding up its business. Gunn still lived in Memphis, and Black negotiated the sales of the property of the firm, and managed the business at Brinkley, where he lived. In the management of this business, he was the agent and trustee of his partner. It was his duty to sell the partnership property at the best price he could obtain for it, and to look solely to the interest of the firm while he was selling its property. The law guards the fiduciary relations with jealous care. It exacts good faith and fair dealing between partners, to the exclusion of all arrangements which could possibly affect injuriously the profits of the firm. It aims to prohibit the possibility of a conflict between the duty of a trustee and his personal interest. The interests of vendor and purchaser are diametrically opposed. To the vendor the highest price, to the purchaser the lowest price, is the greatest good. For the agent of a vendor to permit himself to become interested in a purchase from his principal is to inaugurate so dangerous a conflict between duty and self-interest that this has long been wisely and strictly forbidden. No man, whether he be principal or agent, can be a vendor and a purchaser at the same time; and the agent of a vendor, who intentionally sells his principal's property at less than he can readily obtain for it, or who intentionally becomes interested, as a purchaser, in the subject-matter of his agency, violates his contract, betrays his trust, and makes himself liable for the full value of the property at the time of the sale, or for the profits he derives as a purchaser, at the option of his principal. Warren v. Burt, 7 C. C. A. 105, 58 Fed. 101; Kimberly v. Arms, 129 U. S. 512, 527, 9 Sup. Ct. 355; Michoud v. Girod, 4 How. 503, 554, 555; Bigelow v. Walker, 24 Vt. 149; Dunlap's Paley, Ag. (4th Am. Ed.) 25.

This record clearly shows that Black violated his trust; that he sold partnership property to himself at less than its value; that he sold property of the firm at less than its value to other parties, with whom he was at the same time clandestinely interested as a purchaser; and that in one instance, without his partner's knowledge, he gave away a thousand dollars of the property of the firm, in the hope that this might benefit himself and his friends. In all these cases, equity demands that he be charged with the amounts lost to the firm by this course of action.

Accordingly, $300 will be charged to the defendants, under the twenty-ninth error assigned, because Black sold lot 5, block 35, in the town of Brinkley,—which was partnership property, and was worth $1,000,—to himself, for $700, and caused the lot to be conveyed by the members of the firm to Salinger for that price, who afterwards conveyed it to him (Black) for the same price; thus

deceiving Gunn, at the time he signed the deed, as to the real purchaser, and inducing him to join in the conveyance in reliance upon the good faith of his partner.

$2,520 will be charged to the defendants, under the thirtieth error assigned, because Black sold 280 acres of the lands of the firm, which were worth $4,480, to himself and one McKeown, for $1,960, but concealed from his partner the fact that he was a joint purchaser with McKeown, and caused the title bonds to be made in the name of McKeown only.

Interest at 6 per cent. per annum from January 1, 1874, until December 14, 1892, on the $821 allowed by the court below for the moneys expended by the firm in purchasing, and building improvements in and prior to 1873 upon, the lot owned by Black, and kept by him as a homestead from that time until he died, which amounts to $886.68, will be charged to the defendants, under the thirty-second error assigned, because, during all these years, Black had the sole use and benefit of this expenditure.

Under the thirty-fourth error assigned, $1,000 will be charged against the defendants, because, without his partner's knowledge, Black subscribed and paid that amount from the funds of the firm towards the construction of a bridge at Brinkley in 1887, and the money thus paid was used to purchase lumber and merchandise of a corporation and a partnership doing business at Brinkley, in which Black was heavily interested, so that he derived a profit at the expense of the firm, which had long retired from active business.

Turning now to the cross appeal of the defendants, the principal error they assign is that the court below did not hold that the effect of the deed of January 28, 1882, from the complainant to Black, was to satisfy and release the accounts owing to the firm by the partners respectively, and to settle the accounts between them to that date. According to the books of the partnership, Black was then owing it $18,145.14, and Gunn was owing it $10,-188.76. Prior to August 3, 1872, Gunn, Black, and Moffet each owned an interest of one-third in the partnership property. On that day, Gunn bought the interest of Moffet for $10,000, and from that time until he made the deed of January 28, 1882, he owned an interest of two-thirds, and Black an interest of one-third, in the property of the firm. The accounts owing to the partnership were property of the firm, as much as its other personal property or its real estate, and the accounts owing the firm by the partners were no less the property of the firm than the accounts owing to it by strangers. No intention to satisfy or release either of these accounts against the partners, or to diminish the property of the firm in any way, is expressed in the deed. The record contains much parol evidence offered to explain or modify this instrument, or to show the intention with which it was made; but this testimony is contradictory, confused, and unsatisfactory. Moreover, the deed is clearly complete in itself; its subject-matter is clearly and definitely described; its terms are plain and unambiguous; and it is not subject to addition, modification, or variance by parol evidence. It must stand as it reads. By its terms, it con-

veys to Black "an equal interest in any and all of the property of the firm of John Gunn & Company and in the property of the firm of Gunn & Black. Said property includes all of the property, real, personal, and mixed, accumulated by the firms of John Gunn & Company and Gunn & Black, respectively, since the 12th day of March, 1870. To have and to hold, an equal one-half interest in said granted and bargained property, real, personal, and mixed, of every kind and description, owned or partly owned by me, as a partner of the aforementioned firm."

There are no better rules for the construction of such a deed than (1) that the court may put itself in the place of the grantor, for the purpose of discovering his intention, and then, in view of all the facts and circumstances surrounding him at the time of the execution of the instrument, consider how the terms of the deed may affect the subject-matter; and (2) that, when the intention is manifest, it will control in the construction of the deed, without regard to technical rules. Prentice v. Storage & Forwarding Co., 58 Fed. 437;[1] Witt v. Railway Co., 38 Minn. 122, 127, 35 N. W. 862; Driscoll v. Green, 59 N. H. 101; Johnson v. Simpson, 36 N. H. 91; Walsh v. Hill, 38 Cal. 481, 486, 487. The application of these rules to this deed leaves no room for doubt that the intention of the grantor was to convey to his partner one-sixth of all the partnership property, and thus to vest in him an equal interest in all its assets, including its accounts against the partners themselves. That intention the deed clearly expresses, but it expresses no more; and the court below rightly gave it this effect, and this only.

Another supposed error assigned by the defendants is that the court, after giving this effect to the deed, did not credit Black, in the accounting, with the $11,000 he paid Gunn for this sixth interest in the partnership. But this was not error. The $11,-000 was paid by Black to discharge his individual liability to his partner, and not in payment of any firm debt, and it was properly excluded from the partnership accounts.

In these appeals the complainant assigned 42 errors, and the defendants assigned 6. We have carefully examined all of the evidence relating to each one of them. We have discussed those which question the fundamental rules by which the court was guided in this accounting. We have indicated those which we think should be sustained, and given our reasons for our opinion. Many of the rulings complained of, that we have not specifically mentioned, are governed by the rules we have already announced; and in none of them has any such error intervened in the application of the law, or any such mistake in the consideration of the evidence, as would warrant us in disturbing them.

The decree below is reversed, and the cause remanded, with instructions to the circuit court to vacate all proceedings taken to execute the decree, and to enter a decree in conformity to the views expressed in this opinion, to the effect that the complainant shall recover of and from the defendant Bena Black, administratrix of

[1] 7 C. C. A. 293.

the estate of William Black, deceased, $13,302.40, and interest at 6 per cent. per annum from December 14, 1892, (instead of the $10,070.88 named in the former decree,) to be paid out of the lands allotted to the defendants by the commissioner, Parker C. Ewan, substantially as provided in the former decree. The complainant, John Gunn, will recover of the defendants three-fourths of his costs in this court in each of these appeals.