NATIONAL CASH REGISTER CO. v. NEW COLUMBUS WATCH CO. et al.

SAME v. HALLWOOD CASH REGISTER CO. et al.

(Circuit Court of Appeals, Sixth Circuit. March 22, 1904.)

Nos. 1,220, 1,221.

1. PATENTS—ASSIGNMENT—INSTRUMENTS ENTITLED TO REGISTRATION.

An instrument which does not purport to convey any present interest in an existing patent, or one for which an application is pending, is not an "assignment, grant, or conveyance," within the meaning of Rev. St. U. S. § 4898 [U. S. Comp. St. 1901, p. 3387], and its registration does not operate as constructive notice to an assignee of a patent subsequently applied for, and granted to the person executing the same.

2. SAME—NOTICE TO ASSIGNEE OF EQUITABLE RIGHTS OF THIRD PERSONS.

Where the attorney for an inventor, having been requested by complainant to ascertain whether his client would sell a pending application for a patent, bought such application himself, without disclosing the fact that he was acting for any one else, and then resold and assigned the same to complainant for more than double the price he paid, complainant was not affected by his knowledge that others had an equitable interest therein.

3. SAME—BONA FIDE PURCHASE WITHOUT NOTICE.

Evidence of a fraudulent purpose, or conduct amounting to moral turpitude, is not necessary to deprive a purchaser of a legal title of the advantage of his position. If he is shown to have been aware of such facts as to put a reasonably prudent man upon inquiry, he is chargeable with all the facts which would have been developed if inquiry had been prosecuted with reasonable diligence.

4. SAME—FACTS TO PUT ASSIGNEE ON INQUIRY.

Complainant purchased and took an assignment of an application for a patent which had been pending in the Patent Office for some four years. Six months before the filing of such application, complainant had been in negotiation with the applicant and two other persons for the purchase of prior patents for inventions made by him relating to the same kind of machines, and issued to the three, and was then informed of an agreement between them by which, so long as it continued in force, the other two persons furnished the capital necessary to perfect and patent all inventions made by the inventor relating to such subject-matter, and were to have an equal interest in the patents therefor. In fact, the application bought by complainant covered an invention made under such agreement, and the two persons who furnished the capital were each the equitable owners of a third interest therein. Held, that the facts were such as to put complainant on inquiry, and to charge it with notice of all that might have been learned by such inquiry prosecuted with reasonable diligence, and that it did not acquire a title to the patent subsequently issued which would support a suit for its infringement.

Appeal from the Circuit Court of the United States for the Southern District of Ohio.

Edward Rector, Frank P. Davis, and J. B. Hayward, for appellant. Paul A. Staley and Border Bowman, for appellees.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

LURTON, Circuit Judge. These bills were brought to restrain infringement of patent No. 599,625, issued to the complainant, as assignee of Harry M. Neer, for improvements in cash registers.

The defendants separately pleaded that the complainant was not the owner of the entire and complete interest in said patent, and that Thos. Reynolds and Oliver W. Kelly were each the owners of an undivided one-third interest in the inventions covered by said patent. Issue was taken upon the said plea, and the cases heard together upon the pleadings and evidence by District Judge Thompson, who sustained the pleas and directed the bills to be dismissed.

The invention involved was completed in July, 1893, and an application for a patent made by the inventor in September, 1893. In July, 1897, Neer assigned his pending application to W. H. Chamberlain, and the latter assigned to the complainant, which prosecuted the application and obtained a patent in February, 1898. When Neer made this invention, and when his application was filed, he was associated with Thos. Reynolds and O. M. Kelly under a contract by which the parties were to develop and finally manufacture cash registers and adding machines. Neer was a man of marked mechanical ability and inventive genius, but was without money or credit. Kelly and Reynolds obligated themselves to pay all expenses of prosecuting his inventions, including cost of patents, etc., and to allow him $10 per week for his individual maintenance. Neer agreed, upon these considerations, to assign to Kelly a one-third interest in every invention he should make while this contract lasted, and to Reynolds a like interest. This arrangement seems to have originated as far back as 1890, and prior to 1893 at least three patents had been taken out by Neer for improvements in cash registers; the patents issuing to Neer and to Kelly and Reynolds, assignees, of one-third each. To better secure his interest in all future improvements Reynolds took from Neer, under date of July 22, 1893, a document in these words:

"July 22, 1893.

"Received of Thos. Reynolds $30.00, in consideration of which I assign to him a one-third interest in all my improvements and inventions in Cash Registers or Adding Machines which I have been working on and yet uncomplete. Those completed, those for which application have been made for Pat. or I contemplate making application for Patent upon. In short, it is understood and agreed that he must be given a ⅓ interest in all such patents conceived by me.                                                Harry Neer.

"Witness, W. M. Wise.
"Recorded Aug. 2, 1893."

This was recorded in the Patent Office August 2, 1893. The money thus receipted for was on account of expenses incurred by Neer in the invention here involved.

Neither Reynolds nor Kelly had parted with their equitable interest in this invention when Neer assigned the application in July, 1897, and we agree with the court below in its finding that Kelly and Reynolds were each the equitable owners of an undivided interest in said invention when Neer assigned in 1897, and when the patent issued to his assignees in 1898. The controversy turns wholly upon the question as to whether the complainant company was a bona fide purchaser, without knowledge or notice of this equitable interest of Kelly and Reynolds. This so-called assignment by Neer to Reynolds of July 22, 1893, is undoubtedly valid between the par-

ties, as an assignment of a one-third interest in any future inventions made by Neer. But it was not an assignment of any existing patent or pending application, for Neer had long before assigned a one-third interest in each of his inventions to Reynolds, and the patents had been issued according to the assignment. Neer having by his prior recorded assignments, which did not include improvements, conveyed to Reynolds the one undivided third in all existing patents, and there being no application pending for any patent, there was nothing upon which this document could operate which entitled it to registration as an assignment, grant, or conveyance, under section 4898, Rev. St. U. S. [U. S. Comp. St. 1901, p. 3387]; Robinson on Patents, §§ 411, 769, 785; Wright v. Randel, 8 Fed. 591; Carpenter v. Dexter, 8 Wall. 513, 532, 19 L. Ed. 426; Lynch v. Murphy, 161 U. S. 247, 16 Sup. Ct. 523, 40 L. Ed. 688.

That an assignment of a patent, together with any future improvements thereon, is recordable and operative as a notice to subsequent assignees of patents for improvements, may be conceded. Littlefield v. Perry, 21 Wall. 205, 22 L. Ed. 577; Aspinwall Co. v. Gill et al. (C. C.) 32 Fed. 697. But none of these former assignments included improvements, so that no question of the effect of such an instrument upon later assignees exists. What we decide is that an instrument which was not intended to convey any present interest in any existing patent is not an "assignment, grant, or conveyance," within the meaning of the statute, and that its registration did not, therefore, operate as constructive notice to the complainant company.

Neither do we think the complainants are charged with notice through the knowledge of Chamberlain. Chamberlain was Neer's attorney, and had charge of his application. He was asked to find out whether Neer would sell, and at what price. He bought the application from his client for himself, not disclosing to his client that he was buying for complainant, and then assigned the application to complainant at more than double the price he had paid. In the whole transaction he was acting in his own interest, and in such circumstances there is no presumption that he would disclose his information to his ostensible principal. Thomson-Houston Co. v. Capitol Electric Co. (C. C.) 56 Fed. 849; Pine Mountain Co. v. Bailey, 94 Fed. 258, 36 C. C. A. 229.

That the complainant did not have technical notice of the equitable interest of Kelly and Reynolds in this invention may also be conceded. The real contention is that it had information of facts which put the company upon inquiry, and that they are therefore chargeable with knowledge of all the facts which inquiry would have disclosed. Cordova v. Hood, 17 Wall. 8, 21 L. Ed. 587; Jonathan Mills Co. v. Whitehurst, 72 Fed. 496, 19 C. C. A. 130. At the date of the acquisition of this invention by the National Cash Register Company, it had not culminated in a patent. The right to a patent was pending upon a mere application. This application was filed September 9, 1893, and complainants are undoubtedly chargeable with knowledge of the contents of the file bearing upon that application. Mr. Frank J. Patterson, the general manager of the com-

pany, and its vice president, actively represented his corporation, and, upon an examination of the application, personally directed its purchase. Some steps to this end had been taken by Mr. Rector, the general counsel of the company at Chicago, and the opinion of local counsel at Dayton was subsequently taken as to the claims, and the value of the invention to the complainant; but neither of these gentlemen had, or in the course of their connection with the matter acquired, any knowledge of facts which would in any degree affect their client. Nor is either of them in the slightest degree chargeable with any negligence or bad faith to their client or any one interested in the matter.

Mr. Patterson was the responsible head of his corporation in respect to all such matters, and was the corporation in all that he said and did about the matter. The result must turn upon his knowledge of facts, and the sufficiency of the facts known to him when he brought this application to cast upon him the duty of inquiry. In February and March of 1893 an effort was made to sell to the complainant patents No. 476,295, of June 7, 1892, 490,304, January 24, 1893, and No. 491,020, of January 31, 1893, issued to Neer and to Kelly and Reynolds, assignees of Neer, for one-third each. Mr. Patterson was first approached and the negotiation opened in behalf of Neer by Mr. A. W. Cochran, a relative of Neer's. Patterson was then distinctly informed that Neer and Kelly and Reynolds were associated together for the purpose of devising an improved cash register, and also adding machines; that Neer was the inventor, and Kelly and Reynolds the capitalists; that Neer was under an engagement to assign to them an undivided one-third interest, each, in all of his inventions while in their employment. Cochran was greatly interested in securing for Neer a more favorable employment than he had with Kelly and Reynolds, and testifies as follows:

"I told them my cousin was a poor inventor, and that Kelly and Reynolds had plenty of money, and he was not liable to get his share of his inventions. Mr. Patterson asked me why I did not bring the machine. I told him the machines were at my house (the two cash registers, one in the metallic case, the other in the wooden case, now before us), but that, if he would come to Chicago, Harry would show him the machines. I also told him that Harry would sell with the consent of Kelly and Reynolds, and would come with them on a salary, and they could get the benefit of all his future inventions, of which he had several now in contemplation. Mr. Patterson said 'Yes,' he could see that Harry would not get as much out of it as he would if he had the money to put in it himself, but, of course, Kelly and Reynolds should have the benefits as long as they were furnishing the capital. Q. Did you say anything at that time as to whether Harry Neer could go with the National Company, and give them the benefit of his future improvements or inventions, without the company buying the machine; and, if so, state what you remember about this? A. I told the Pattersons that Harry could not leave Kelly and Reynolds, without these machines were sold first, and that then he would be free to come with them and give them the benefits of his future improvements. Q. Was anything said to the Pattersons about Neer's contract with Kelly and Reynolds as to inventions that he would make or improvements that he would get up in cash registers? A. Certainly. I already explained to the Pattersons that so long as he was with Kelly and Reynolds they would get the full benefit of his inventions, and I wanted them to buy this machine in order to get the benefits of very valuable improvements

which he already had in mind. I wanted to get them out of the way completely, as we had to get them out of the way before we could do anything with the Pattersons. Q. Who do you mean by 'them,' when you say you wanted to get them out of the way? A. Kelly and Reynolds, because Harry was to them under contract, and could not leave until these machines were sold, and the Kelly and Reynolds business was cleaned up."

As a result of this interview, Mr. Frank J. Patterson went to Chicago to see the model of the machine made under these three patents. Under date of March 8, 1893, he wrote to A. W. Cochran, declining to buy, and saying that Neer's machine infringed the patents of the company, though he did not then point out wherein. Shortly thereafter, and during the same month, the complainant company invited a further conference. For this purpose, Mr. Samuel Cochran, the father of A. W. Cochran, and an uncle of Neer's, together with Neer himself and O. W. Kelly, went to Dayton, and to the shops of the complainant company, and there exhibited and operated the Neer machine. This negotiation extended through parts of three days. Mr. Cochran's principal purpose seems to have been to secure for Neer an engagement as inventor, and he testifies that he told Patterson that he was anxious to get Neer away from Kelly and Reynolds, who were paying him only $10 per week. He had drawn up a proposed contract between Neer and the complainant, by which the complainant was to have the exclusive right to all of Neer's improvements and future inventions. This contract, he says, was exhibited to and read by Patterson, and also certain contracts between Neer, Kelly, and Reynolds in respect to the formation of a company to make machines. The witness testifies that he told Patterson that Reynolds and Kelly were to have all the benefits of Harry M. Neer's future inventions and improvements in the cash register business, and "that the benefits that I had put in their contract [referring to proposed contract for services of Neer] was the same that was in the contract between Kelly, Reynolds, and Neer." This contract was only proposed in the event the cash register company bought the Neer patents, for Patterson was told that any employment of Neer was dependent upon the sale of the patents owned by the Neer Company. This witness also says that he told Mr. Patterson that Neer had quite a number of improvements in cash registers, "but that I did not want to let Kelly and Reynolds know of those improvements, because I knew they would not raise his salary sufficiently for him to spend his time and remain with them." He also says that Neer showed Mr. Patterson certain "small diagrams, drawn on paper, of improvements, and a way by which he could get around some of the difficult questions that was raised in regard to opening the drawers and raising the tablets."

The sale of the patents and the employment of Neer were coupled together by Mr. Cochran, who demanded for Neer $600 per month, and a contract for five years. Representing, as he ostensibly did, all of the owners of the patents, he manifested a willingness to sacrifice the Neer Company, in the price of its patents, in order to secure greater advantages for his nephew in the matter of wages, and he confesses to using arguments of this character.

Without going further into the details of the conference and negotiations for the sale of the earlier Neer patents, it is enough to say that, upon the great weight of the evidence, Patterson was during those negotiations fully made aware of the relations between Neer and Kelly and Reynolds, and of their interest in all future improvements Neer might make in cash registers, so long as that association should continue. The negotiations came to nothing, Mr. Patterson claiming that the Neer automatic drawer and indicator infringed two patents owned by his company.

The evidence establishes that, after this failure to sell, Neer at once went to work upon an improved cash register which should obviate the infringements in respect to the drawer and indicating tablets pointed out or claimed by Patterson, and soon produced a model of the machine here involved. This model was sent to Mr. W. H. Chamberlain, a patent lawyer at Chicago, in July, 1893, for the purpose of preparing specifications and claims, and an application for a patent was filed September 15, 1893. All of the expenses incident to this new machine were borne by Kelly and Reynolds. This application hung in the Patent Office, and in 1895 an interference was declared with a pending application owned by the complainant in respect to certain claims common to both, in which the complainant company won out. This interference necessarily called attention to this new invention. As before stated, this application hung along until July, 1897, when, upon the suggestion of Mr. Rector, the complainant's general patent solicitor, who had represented complainant in the Erlach interference mentioned above, Mr. Patterson examined Neer's new application, and bought it for his company, without making any inquiry as to whether Kelly and Reynolds had any interest therein or not. The invention which was involved in the Neer application did not in express terms assume to be an improvement upon his earlier patents. In fact, however, it was an improvement by which Neer had attempted to obviate the infringement claimed by Patterson in respect to the automatic drawer and tablet. The character of the improvement was in itself adapted to recall the information he had received when Neer's earlier machine was offered to him. In addition to this, Mr. Rector, in his letter suggesting the purchase of this application, called attention to the Neer earlier patents, and suggested that, if "we take the Neer application, we had better take the entire lot."

Mr. Patterson does say that he cannot recall his having read any papers in connection with the effort made in 1893 to sell his company the three existing Neer patents. He does, however, admit a recollection of so much which occurred in that negotiation that it is difficult to believe that he had forgotten the relation of Neer to Kelly and Reynolds. He admits that he recalls the fact that the younger Cochran first came to open the way, that the elder Cochran and Neer then came, and that finally he saw the elder Cochran and Kelly and Neer on the third visit to his factory. Reynolds, it is conceded, had no part in the negotiations which then occurred, though Cochran says he explained to Mr. Patterson the reasons for his absence. Asked by his counsel to explain what occurred on the

occasion of the visit of Neer, Kelly, and the elder Cochran at the time the machine was exhibited, he says:

"These gentlemen came to visit the factory upon an invitation from me to exhibit their machine, and, as I understood the situation, Mr. Cochran was the promotor of the Neer Company. Mr. Neer, the inventor of the machine, came to apparently offset any remarks which might be made, calculated to keep Mr. Kelly from investing any money in their company; and, as Mr. Kelly was financially able to carry out any commercial enterprise into which he might engage, I endeavored to convince him that this machine of Neer's could not be made cheap enough or simple enough to ever become a successful cash register. I did not pay any attention to Mr. Neer or to Mr.Cochran, as I knew they would not pay any attention to anything I might say derogatory to their enterprise or machine. From subsequent events, Mr. Kelly declined to go into the enterprise at all. The cash register company was apparently abandoned. Mr. Cochran was very anxious to sell the Neer device and secure for Neer a good position, but, not being successful, he returned to Chicago, and I have heard nothing from him since. The details of all of these conversations, it is not necessary to relate, even if I could remember them. Suffice it to say that these same kind of interviews are constantly held with promoters and inventors of cash registering devices, and for that reason, after the interview was over, I do not often retain more than a casual memory of the circumstances."

While he does say that he has no recollection of ever examining any contracts, or of their contents, or of hearing the name of Reynolds mentioned, he does not in terms deny that he was then informed in respect of the engagement between Neer and his associates, and of the interest of the latter in his subsequent improvements. Neither is it claimed by counsel that he had forgotten what occurred during the 1893 negotiations. Indeed, the very able and frank solicitor for complainant resents the suggestion that he defends upon the ground that Mr. Patterson had forgotten in 1897 the facts which he knew in 1893 in respect of Neer's relations to Kelly and Reynolds. The contention, on the contrary, presented by the briefs, is, first, that complainant had no definite information at any time "that Kelly and Reynolds had or were to have any interest in Neer's future inventions, and that, whatever the character of the information possessed in 1893, the subsequent events known to it were such as, in the absence of knowledge of facts now disclosed by the record, but which were unknown to complainant, to create a reasonable presumption, upon which complainant was justified in acting, that four years later, at the time it purchased, in 1897, Neer was the sole and exclusive owner thereof."

We can see no ground for regarding the information possessed by Mr. Patterson as either vague or indefinite in respect of the interest of Kelly and Reynolds in any further improvements which Neer should patent in respect to cash register machines. The principal object of the negotiations, so far as they were conducted by the two Cochrans, was to secure for Neer with the cash register company a better contract than he then had with Kelly and Reynolds; and, if those witnesses are to be believed, they informed Patterson fully as to the interest of Kelly and Reynolds in his future inventions so long as his existing relations should last. Now, what were the "subsequent events" known to Patterson, when he bought, which are relied upon to create a presumption upon which he was

justified in assuming that the application was the "sole and exclusive property of Neer"? They are substantially as follows: (1) That this application had been on file four years without any assignment to Kelly and Reynolds being filed in the office, whereas such an assignment of his earlier patents had been filed either with the application or shortly thereafter; (2) that the contract between Neer and associates was terminable at will or upon 10 days' notice, and the interest of Kelly and Reynolds was only in such improvements as should be made while those relations lasted; (3) that in fact this partnership was terminated soon after the Dayton negotiations, and that Neer engaged in a different line of inventions; (4) that in April, 1894, a patent issued to Neer and Cochran upon an application filed in April, 1893; (5) that Neer represented that he had made no assignment, and so covenanted in his assignment to Chamberlain.

It is to be borne in mind, in giving due weight to the circumstances mentioned, that Patterson is chargeable with the knowledge that the application he was buying had been filed within about six months of the close of his negotiations for the purchase of the earlier Neer machine. The question he had to ask himself in 1897 was not whether the arrangement between Neer and his associates had continued up to that time, but whether it had not continued up to the time of an application for an improvement made, which had been filed within six months of the close of his former negotiations. Now, he did not know, and could not know, for the fact was otherwise, that Neer had ceased to work with and for Kelly and Reynolds when this application was filed. Neer finished the model for his improved machine in July, 1893, with their means, and placed it in the hands of an attorney to obtain a patent; the application being filed September 15, 1893. Some time about the time of this application, Neer and associates did dissolve, and he took work with the father of O. W. Kelly, and took up a new line of inventions. But the actual fact that the relations of these three men had terminated even in 1897 was not even then known to Patterson. All that he knew about the abandonment of the cash register business consists in the fact that he had heard nothing more about it, and had been told by a Mr. Mast, some two or three years after the negotiations of 1893, "that he [Mast] was of opinion that Mr. Kelly saw no outcome in the cash register, and had decided not to go into the field." This, of course, referred to the scheme of getting up a factory to make the Neer machines, which was a part of the purpose of the Neer Company made known to Patterson in 1893. But counsel frankly do not claim that he knew in 1897 that the Neer Company had broken up, and modestly only insist that Patterson had a right "to assume that it had been abandoned"—a correct assumption if the question was as to its continuance up to 1897, but an incorrect one if it be an assumption that the relation did not exist when the invention in question was made. The assumption that Patterson knew that in 1894 a patent had issued to Neer and Cochran upon an application made within a month after the close of the 1893 negotiations is unauthorized. The fact is true. But it does not appear that Patterson

knew it when he bought the later application. It was in fact a patent in which Kelly and Reynolds were interested, but it was taken out to Cochran and Neer because Cochran was dominating Neer, and wished it done to secure him in some advance he had made about it. As he was the agent for all the parties, he held it in trust, and so recognized himself as a trustee. That patent was not in the line of the title of any of the complainants' patents, and hence there is no constructive notice about its issuance. If Patterson did not himself know that such a patent had issued to Neer and Cochran, it could not mislead him, and could have cut no figure whatever in leading him to presume the relation of the parties ended when the application in question was filed in September of 1893. That he knew the contract between Neer and Kelly and Reynolds was to endure only so long as the parties wished, must be conceded. But why he should assume that an application for a patent, made so soon after he had declined to buy the first Neer machine, and which was to him manifestly intended to escape the charge of infringement which he had brought against the first Neer machine, should be the sole property of Neer, is not explained. Reasonably the presumption, under the facts known to him, was that such an improvement would be for the benefit of the partnership; and, in the absence of very clear evidence otherwise, he should have so assumed. The representation by Neer that he had made no assignment, and his covenant to that effect, is of no importance whatever. He did not even represent that no one had any equitable interest in his invention, and said nothing and was asked nothing about the dissolution of his partnership with Kelly and Reynolds. In view of the facts known to Patterson, the natural inquiry would have been, not, "Have you made any assignment?" but, "Are you equitably under any obligation to do so by reason of your contract with them? When did your agreement to give them an interest in your inventions come to an end?" But if he had caused these questions to be put to him, he would have acted with great negligence if he had failed to inquire of Kelly and Reynolds as to their claim of interest in this particular invention. The assumption that they had no interest in this invention, in view of the facts with which Patterson is chargeable with knowing, rests at last upon the fact that this application had been pending four years, and that no assignment had been recorded of which he was obliged to take constructive notice. In actual fact, an assignment, under date of July 22, 1893, had been spread upon the registry of the Patent Office, by which he had assigned to Reynolds a one-third interest in all of his improvements and inventions in cash registers which he had been working on, and for which he contemplated filing applications. This assignment did not operate as a constructive notice, because it was not such a grant or conveyance as was entitled to registration. Lynch v. Murphy, 161 U. S. 247, 16 Sup. Ct. 523, 40 L. Ed. 688; Carpenter v. Dexter, 8 Wall. 513, 532, 19 L. Ed. 426; Prentice v. Duluth Storage Co., 58 Fed. 437, 7 C. C. A. 293, 302; Robinson on Patents, § 785; Wright v. Randel (C. C.) 8 Fed. 591. Neither did it request the commissioner to issue any particular patent to an assignee, and the

commissioner therefore properly ignored it when he came to issue this patent. Rev. St. § 4895; Robinson on Patents, §§ 411, 769, 785; Wright v. Randel (C. C.) 8 Fed. 591. Neither is it shown that Patterson or any of the agents or attorneys of the complainant corporation had any actual knowledge of this document. But on the other hand, it is not shown that any search of the record was ever made to see if any assignment had been recorded. Such an actual search would undoubtedly have disclosed this assignment. There was therefore no actual misleading by the failure of the record to disclose any assignment, for the proper place for such an assignment would have been upon the registry, and not in the file. Rev. St. U. S. § 4895.

The court below, after an exhaustive examination of all the facts and circumstances of the case, reached the conclusion that the facts known to the complainant company at the time of its purchase were such as to put it upon inquiry. The facts which the complainant must be taken to have known pointed plainly to the probable existence of a right or title in conflict with that which they were about to buy. It became complainant's duty, therefore, to make inquiry as to the existence and extent of this probable outstanding equitable, but prior, right; and an inquiry of Neer only was not a reasonable compliance with this duty. The failure to make reasonable inquiry under such circumstances convicts complainant of a degree of negligence inconsistent with the claim to be a bona fide purchaser without notice. The knowledge which its representative in this transaction had did not consist of vague rumors as to the possible rights of another. It was knowledge that tended strongly to show that Kelly and Reynolds were interested in the invention he was about to buy, and was not materially weakened by any subsequent facts known to him at the time he was called upon to act. It may be that Mr. Patterson did not have at the time any purpose to deliberately shut his eyes to the facts which inquiry might disclose, for that would amount to mala fides or fraud, and we do not attribute any evil purpose to him. The price he was asked to pay was a small one for a great concern, such as that he represented. When asked about the extent of his examination of the application before buying, he said:

"I may or may not have examined the file wrapper, and cannot state positively upon this point. If the case was an important one, I should probably have an opinion submitted, or read it over myself. In this case I am under the impression that, the amount involved being so small, that I told Mr. Macauley he might buy the patent if the amount did not exceed $200. That is about all I remember about it."

Under such circumstances, he may well say, as he does, that he at the time had no knowledge that any one beside Mr. Neer owned or claimed any interest in the invention. But he did have information which made it his duty to inquire whether others did not have an interest in this inchoate property, and this he doubtless would have done but for the comparative insignificance of the matter, which induced a very negligent method of action, which justly deprives his corporation of its claim to be a bona fide purchaser without notice. Evidence of a fraudulent purpose or conduct amounting to moral

turpitude is not necessary to deprive a purchaser of a legal title of the advantages of his position.

The English cases for a time seemed to tend toward a rule requiring evidence indicating a deliberate shutting of the eyes to avoid light, and amounting to what some of the judges styled fraud. 2 Pom. Eq. § 606, and notes, and cases there cited. But the latest announcement seems to repudiate this extreme view. Oliver v. Hinton, 2 L. R. Ch. D. 1889, 264. The test of the American courts has not been so extreme. The inquiry has generally been whether the facts known were such as to put a reasonably prudent man upon his guard, and whether an inquiry has been prosecuted, with reasonable diligence. 2 Pom. Eq. § 606, and notes. The latest announcement of the Supreme Court of the United States is that found in Stanley v. Schwalby, 162 U. S. 255, 276, 16 Sup. Ct. 754, 763, 40 L. Ed. 960, where Justice Gray said:

"But in order to charge a purchaser with notice of a prior unrecorded conveyance, he or his agent must either have knowledge of the conveyance, or at least of such circumstances as would, by the exercise of ordinary diligence and judgment, lead to that knowledge; and vague rumor or suspicion is not a sufficient foundation upon which to charge a purchaser with knowledge of a title in a third person."

The decree of the court below must be affirmed.