## UNIVERSAL OIL PRODUCTS CO. v. ROOT REFINING CO.

## SAME v. SKELLY OIL CO.

### Nos. 716 and 895, 893 and 785.

District Court, D. Delaware.

Oct. 9, 1936.

Thomas G. Haight (of Wall, Haight, Carey & Hartpence), of Jersey City, N. J., William F. Hall and Charles M. Thomas (of Bacon & Thomas), both of Washington, D. C., and E. Ennalls Berl (of Ward & Gray), of Wilmington, Del., for plaintiff.

J. Bernard Thiess, Thorley von Holst, and Sidney Neuman (of Jones, Addington, Ames & Seibold), all of Chicago, Ill., and Arthur G. Logan (of Marvel, Morford, Ward & Logan), of Wilmington, Del., for defendants.

W. P. Z. German, of Tulsa, Okl., of counsel for Skelly Oil Co.

NIELDS, District Judge.

Hearing on issues raised by a special defense in answers to original bills in the nature of supplemental bills.

These supplemental bills aver that on January 14, 1936, plaintiff had "assigned its entire right, title and interest in and to the aforesaid invention and improvement, and in and to said letters patent" to Uni-

versal Oil Products Company, a Delaware corporation, and prayed that the assignee be substituted "as plaintiff in place, and instead, of its assignor, Universal Oil Products Company, a Corporation of South Dakota," plaintiff in these suits. Answers filed to these bills aver that the legal effect of a certain bill of sale and agreement entered into January 1, 1932, between said South Dakota corporation and said Delaware corporation, and the construction given said agreement by the parties, wrought an abatement of the original suits and deprived this court of jurisdiction to enter a decree awarding injunctions; and that the decrees themselves and the trial proceedings upon which they were based were nugatory.

Hereafter in this opinion Universal Oil Products Company, a corporation of the state of South Dakota, shall be referred to as "South Dakota," and Universal Oil Products Company, a corporation of the state of Delaware, shall be referred to as "Delaware."

A brief outline of the steps in the suits may be helpful. In 1929 South Dakota filed its bill of complaint against Root Refining Company charging infringement of the Egloff patent, and in 1931 charging infringement of the Dubbs patent. In 1930 South Dakota filed its bill of complaint against Skelly Oil Company on the Egloff patent, and in 1931 on the Dubbs patent. The Root cases were consolidated for trial and were tried throughout the summer of 1932, accumulating a record of 3,904 pages with 1,500 pages of exhibits. In May, 1934, an interlocutory decree was entered finding validity and infringement of the Dubbs and Egloff patents and awarding an injunction and an accounting of profits and damages. In June, 1935, this decree was affirmed by the Circuit Court of Appeals. 78 F.(2d) 991. Petitions for rehearing and for writs of certiorari were presented and denied.

296 U.S. 626, 56 S.Ct. 149, 80 L.Ed. 445. In February, 1936, Delaware set up in its bills of complaint in the nature of supplemental bills, the assignment to it of the Egloff and Dubbs patents and claims for damages, and praying that it be substituted as plaintiff in place of South Dakota, the plaintiff herein. An order was entered granting such leave and supplemental bills were filed in both of the Root cases. In March, 1936, Root filed answers to the supplemental bills setting up an abatement of the causes of action in both Root cases on January 1, 1932, when the bill of sale and agreement between South Dakota and Delaware was entered into. In its answer Root Refining Company prayed:

"1. That all proceedings, including the entry of the interlocutory decree, had herein subsequent to January 1, 1932, and prior to the filing herein of the Bill of Complaint in the Nature of a Supplemental Bill be abated, set aside, and held for naught.

"2. That the Bill of Complaint in the Nature of a Supplemental Bill heretofore filed herein by the Universal Oil Products Company of South Dakota be dismissed for want of equity."

In the Skelly cases there have been no trial proceedings. The cases are at issue. In February, 1936, an order was entered granting plaintiff leave to file supplemental bills substituting Delaware as sole party plaintiff in lieu of South Dakota. Answers were filed and the issues of abatement were by agreement consolidated for trial with the Root cases, it being stipulated that all evidence adduced in the Root cases was also adduced in the Skelly cases.

At the hearing in June, 1936, defendant Root Refining Company introduced the following in evidence:

Contract of January 1, 1932, between South Dakota and Delaware (reproduced at length in footnote).[1] Certain interroga-

---

[1] "Bill of Sale and Agreement, dated as of January 1, 1932, between Universal Oil Products Company, a South Dakota corporation (hereinafter sometimes called the Old Company), party of the first part, and Universal Oil Products Company, a Delaware corporation (hereinafter sometimes called the New Company), party of the second part.

"Whereas the New Company has recently been organized under the laws of the State of Delaware for the purpose, among others, of acquiring certain of the assets and business of the Old Company;

"Now therefore, in consideration of the premises, and of the assignment, transfer and conveyance hereinafter made, and of the covenants and agreements herein contained, the parties hereto have agreed, and do hereby agree, with each other as follows:

"I. The Old Company hereby sells, assigns, conveys, transfers, sets over and delivers unto the New Company all the business, assets, property, good will, rights and privileges now owned by the Old Company and to which it is now or may hereafter become entitled, of every description, real, personal and mixed,

tories propounded by defendant to plaintiff and the answers thereto. Affidavits of Hiram J. Halle filed in the case of Derby Oil Company v. Universal Oil Products Company in the District Court of the United States for the District of Kansas, Second Division. Affidavit of Sidney Neuman.

Defendant's position is that the evidence above recited establishes that before the trial in the Root cases South Dakota had sold and conveyed to Delaware (with the exception of the Trumble patent) all of its property and assets, including the monopoly of the patents in suit and the right to any recovery thereon, and had parted with all its right to equitable relief upon which its standing in this court depended, and therefore the causes of action then

tangible and intangible, wherever situated, *excepting, however, therefrom (a) all Letters Patent issued by the United States of America or any other government or political division thereof and all pending applications for Letters Patent owned or controlled by the Old Company at the date hereof, (b) all the Old Company's right, title and interest in, to and under suits instituted by it for damages sustained by reason of infringement of any of its Letters Patent by whatsoever government issued, and all its right, title and interest in and to any and all claims or causes of action or accrued rights of action for past · damages and profits including any and all causes of action for infringement of any of its patents, (c) all its right, title and interest in to and under patent interference or annulment, revocation and opposition proceedings in the United States or elsewhere,* (d) all existing license agreements under which the Old Company has granted rights in respect of Letters Patent owned by it (said license agreements being hereinafter sometimes called the License Agreements, and the licensees thereunder, listed in Schedule A annexed hereto, being hereinafter sometimes called the Present Licensees), (e) all accounts receivable, promissory notes and certificates of indebtedness from the Present Licensees now held by the Old Company, (f) any sums at any time hereafter collected from any persons, firms or corporations in respect of infringement of Letters Patent No. 1,281,884, dated October 15, 1918 and issued to M. J. Trumble (said Letters Patent being hereinafter sometimes called the Trumble Patent) and (g) that certain leasehold estate of certain real estate situated in Arkansas City in the State of Kansas created by Indenture of Lease dated the 1st day of July, 1922, by and between The Milliken Company and the Old Company, and Indenture of Sublease dated July 1, 1922, between Moore Refining Company and the Old Company, said Leasehold estate being hereinafter sometimes referred to as the Milliken Lease.

"The business, assets, property, good will, rights and privileges hereby sold, assigned, conveyed, transferred, set over and delivered, or intended so to be, include particularly (but without any limitation of the foregoing general language) the following:

"(1) All the Old Company's present inventions in respect of which it shall have made no applications for Letters Patent at the date hereof and all its future inventions at any time hereafter acquired by it, and all its right, title and interest therein and thereunder, subject, however, to the rights, if any, with respect thereto of the Present Licensees;

"(2) All the Old Company's assignable licenses, immunities, rights and other interests under, from or to all Letters Patent and applications for Letters Patent owned by others, subject, however, to the rights, if any, with respect thereto of the Present Licensees;

"(3) All the Old Company's right, title and interest in and to any real estate wheresoever situated and all buildings and appurtenances thereon, all equipment and machinery located therein or thereon and all leases in respect thereof (except as otherwise herein expressly provided with respect to the Milliken Lease), including specifically (but without any limitation of the foregoing general language) the following described property:

"All that certain tract of land located in Cook County, Illinois, more particularly described as follows:

"That part of the West half of the North East quarter of Section eleven (11), Township thirty-eight (38) North, Range twelve (12), East of the Third Principal Meridian, lying South of the Joliet and Lyons Road and North Westerly of the North Westerly line of the lands conveyed to the Chicago and Illinois Western Railroad by deed recorded April 1, 1905 as document 3673452 and Northerly of the Northerly line of the lands conveyed to The Lyons Belt Railroad, by deed recorded February 1, 1905 as document 3649960, that part of the East half of the North West quarter of Section eleven (11), Township thirty eight (38) North, Range twelve (12), East of the Third Principal Meridian, lying South of the Joliet and Lyons Road and Northerly of the Northerly line of the lands conveyed to The Lyons Belt Railroad by deed recorded February 1, 1905 as document 3649960, all in Cook

abated and the proceedings both in the Root and Skelly cases subsequent to January, 1932, and prior to February, 1936, were nugatory. A careful consideration of the evidence leads the court to conclude that it does not establish the position of the defendant above recited.

However, the important question whether the agreement of January 1, 193.

completely divested South Dakota of all title and interest in the patents and in the pending suits so that the suits abated and all proceedings were nugatory. Defendant does not question the procedure to substitute Delaware as plaintiff or its right to be so substituted and to have the benefit of all proceedings and of all decrees, provided the defense of abatement is not sustained.

---

County, Illinois; subject to a dedication of a portion of said premises to the public for the purpose of a public highway as shown on a Plat of Dedication for Public Highway Sec. 11, T 38 N–R 12 E of the Third Principal Meridian Route 4, Section 430, prepared by J. Skale, and subject to a certain grant by Indenture, dated June 26, 1930, between the Old Company and John H. Guhlick;

"(4) All accounts receivable, promissory notes and certificates of indebtedness at the date hereof or subsequently owned or acquired by the Old Company, excepting, however, accounts receivable, promissory notes and certificates of indebtedness of or from the Present Licensees under their contracts with the Old Company;

"(5) All shares of stock, bonds and evidences of indebtedness (except evidences of indebtedness of the Present Licensees) of other corporations or individuals at the date hereof or subsequently owned or acquired by the Old Company, including specifically, but without limiting the generality of the foregoing, 250 shares of the capital stock of Gasoline Patents Corporation, a Delaware corporation;

"(6) All inventories, blue prints, office furniture, equipment, materials and supplies of every nature and description whatsoever;

"(7) All contracts, agreements and credits of whatsoever nature, including specifically without limiting the generality of the foregoing language, all insurance policies, real estate title policies and advertising agreements or contracts, but not including any contracts, licenses or other agreements herein expressly excluded from the sale, assignment, transfer and conveyance hereby made or intended to be made; and

"(8) All its cash in bank and on hand at the close of business on January 1, 1932, except $100,000, which is expressly reserved to the Old Company.

"II. The Old Company hereby grants to the New Company the sole and exclusive right and power to grant future licenses under all Letters Patent and pending applications for Letters Patent at the date hereof or subsequently owned or controlled by the Old Company (in-

cluding specifically without limitation of the foregoing general language, the Letters Patent listed in Schedule B annexed hereto) which are not intended to be conveyed or transferred to the New Company by these presents; and the Old Company hereby covenants and agrees that it will not grant any new or additional licenses under any of said Letters Patent or applications except such as it shall be obligated to grant by the terms of any of its License Agreements with its present licensees. The Old Company also hereby grants to the New Company the right and power to grant to the licensees of the New Company the right to use all inventions at the date hereof or subsequently owned or controlled by the Old Company, and to extend to such licensees all immunities from suits for infringement of Letters Patent of others which the Old Company may be able to grant or extend to its licensees and their sublicensees under any agreements which the Old Company may now or hereafter have with others.

"III. The Old Company hereby covenants and agrees to use its best efforts to procure from the Present Licensees their several consents to the transfer and assignment of their respective License Agreements to the New Company, and to transfer and assign to the New Company at its request said License Agreements from time to time as such consents are procured.

"IV. The Old Company hereby agrees that as soon as it shall have obtained the several consents of all of the Present Licensees to the transfer and assignment of their respective License Agreements to the New Company, it will, at the request of the New Company, assign, transfer, convey and deliver to the New Company all Letters Patent and reissues thereof issued by the United States of America or any other government or political division thereof, all pending applications for Letters Patent and all other property and interests of whatsoever nature then owned or controlled by the Old Company, without any other or further consideration therefor than the performance by the New Company of the covenants and agreements herein con-

When the suits were instituted in 1929, 1930, and 1931, South Dakota was the only proper plaintiff. In 1932 Delaware was formed by United Gasoline Corporation, owner of all the capital stock of South Dakota. Since December, 1934, Delaware has owned all the stock of South Dakota except one director's qualifying shares. At all times the directors (except the resident director of South Dakota), the officers, and the stockholders of South Dakota and Delaware have been the same. There never has been any possibility of defendant being required to answer to more than one person for infringements. If Delaware be substituted, it will be the only party capable of prosecuting the suit.

The defense of abatement cannot be sustained unless the agreement of January 1, 1932, is construed to be an assignment of the patents in suit and of the entire interest of South Dakota therein. Unless the agreement of January 1, 1932, be construed to be an assignment, there was no abatement of the suit before the actual assignment of January 14, 1936. Apparently defendant fully acquiesces in this position.

---

tained on its part to be performed and the payment and discharge by the New Company of all obligations and liabilities hereby assumed by it; provided, however, that the Old Company shall not be obligated to assign, transfer or deliver to the New Company United States Letters Patent No. 1,281,884, dated October 15, 1918, issued to N. J. Trumble which letters patent including any and all accrued rights of action for past damages and profits and including any and all causes of action for infringement of said letters patent, are not to be assigned but are to be expressly reserved to the Old Company.

"V. The Old Company will, as Trustee for the New Company, collect from the Licensees of the Old Company, all notes and accounts receivable and certificates of indebtedness now or at any time hereafter owing to it by the Licensees, and will immediately upon such collection pay the same to the New Company. The New Company will advance to the Old Company such sums as shall be reasonably necessary to cover the expenses of such collection.

"VI. The Old Company hereby constitutes and appoints the New Company, its successors and assigns, the true and lawful attorney or attorneys in fact, irrevocable, of the Old Company, with full power of substitution, in the name of the Old Company or otherwise but on the behalf and for the benefit of the New Company, its successors and assigns, to exercise from time to time any and all of the rights, privileges and powers of the Old Company in respect of the properties, assets, business and good will hereby assigned, transferred and conveyed or intended so to be, or any of them, to demand and receive all moneys and other property, tangible or intangible, payable or deliverable to the Old Company and intended to be hereby assigned and conveyed to the New Company, and to give receipts, releases and acquittances for or in respect of such moneys and other property and to institute and prosecute in the name of the Old Company or otherwise any and all proceedings at law, in equity or otherwise which the New Company, its successors or assigns, may deem necessary or proper to secure and enforce or exercise such rights, privileges and powers or any thereof, and to do any and all other acts and things in relation thereto which the New Company, its successors or assigns, may deem desirable.

"VII. The Old Company will, whenever requested by the New Company, do, sign, execute, acknowledge and deliver or cause to be done, signed, executed, acknowledged and delivered, any and all such other and further acts, deeds, assignments, transfers, conveyances and assurances as the New Company may reasonably request in order more fully and effectually to vest in it the properties, assets, business and good will hereby intended to be assigned, transferred and conveyed to it.

"VIII. The New Company hereby assumes and agrees to pay or perform, when and as payment or performance may be due, (a) all the covenants, warranties, indemnities and guaranties, and agreements and obligations, contingent or otherwise, of the Old Company under all its leases, contracts, licenses, agreements and other instruments, whether or not the same are hereby sold, assigned, conveyed, transferred, set over and delivered to the New Company or intended so to be, and (b) also all unpaid indebtedness, other liabilities and obligations (including income, franchise and other corporate taxes) and insurance premiums of the Old Company. The New Company also assumes and agrees to pay all expenses of whatsoever nature incurred in connection with or as a result of the sale, assignment, transfer and conveyance hereby made or intended to be made. Nothing in this paragraph VIII or elsewhere in this Bill of Sale and Agreement contained shall in any way be construed or

Yet, abatement only occurs in an equity suit where the sole plaintiff has disposed of his entire interest. If South Dakota retained any interest in the patents, the suits never abated.

The Supreme Court holds that an assignment of a patent may be effected:

"(1) the whole patent, comprising the exclusive right to make, use, and vend the invention throughout the United States; or (2) an undivided part or share of that exclusive right; or (3) the exclusive right under the patent within and throughout a specified part of the United States. * * *

"A transfer of either of these three kinds of interests is an assignment, properly speaking, and vests in the assignee a title in so much of the patent itself, with a right to sue infringers. In the second case, jointly with the assignor. In the first and third cases, in the name of the assignee alone. Any assignment or transfer, short of one of these, is a mere license, giving the licensee no title in the patent, and no right to sue at law in his own name for an infringement." Waterman v. Mackenzie, 138 U.S. 252, 255, 11 S.Ct. 334, 335, 34 L. Ed. 923.

This court has said: "An assignment of a patent may be made only by an instrument in writing. R.S. § 4898 (Comp. St. § 9444 [35 U.S.C.A. § 47]). Conceding that no particular form of words is essential to effect an assignment of a patent (American Tobacco Co. v. Ascot Tobacco Works [C.C.] 165 F. 207), yet to constitute an assignment the instrument must be substantially a transfer, actual or constructive, with the clear intent at the time to part with the legal interest, in whole or in part, in the thing transferred, and with the full knowledge of the rights so transferred: Ormond v. Connecticut Mut. Life Ins. Co., 145 N.C. 140, 58 S.E. 997, 998. An instrument which does not purport to convey any present interest in an existing patent, or in one for which an application is pending, is not an assignment within the contemplation of R.S. § 4898. National Cash Register Co. v. New Columbus Watch Co., 129 F. 114, 116, 63 C.C.A. 616. There must be some operative words, expressing at least an intention to assign, in order to constitute an assignment." Minerals Separation, Ltd., v. Miami Copper Co. (D.C.) 275 F. 572, 575.

operate so as to in any way release or discharge any other persons, firms or corporations which are not parties hereto from their full and entire liability and obligations of every nature to the Old Company.

"IX. The New Company hereby agrees to indemnify and hold harmless the Old Company and its directors, officers and stockholders from and against any and all the covenants, warranties, indemnities, guaranties, agreements, indebtedness, liabilities and obligations above referred to in paragraph VIII hereof, and from and against any and all liability or responsibility of whatsoever nature at any time incurred by the Old Company or its directors, officers or stockholders, or any of them, in connection with or as a result of the sale, assignment, transfer and conveyance hereby made or intended to be made.

"X. The New Company hereby grants to the Old Company the right and power to grant to the Present Licensees (a) licenses under all of the Letters Patent and applications for Letters Patent at the date hereof or subsequently owned or controlled by the New Company under which it shall have the power to grant licenses or sublicenses, and (b) all such immunities from suits for infringement of Letters Patent of others as the New Com-

pany may be able to grant or to extend to its licensees and their sublicensees under any agreements which the New Company may now or hereafter have with others.

"XI. The New Company hereby agrees forthwith to issue and deliver to the present stockholders of the Old Company, ratably according to their stockholdings therein, 1,000 full paid and non-assessable shares, of the par value of $100 each, of the capital stock of the New Company.

"XII. This Bill of Sale and Agreement shall benefit and bind the parties hereto and their respective successors and assigns.

"In witness whereof, the parties hereto have executed this Bill of Sale and Agreement in two counterparts the day and year first above written.

"Universal Oil Products Company,
"a South Dakota corporation
"By [Signed] H. J. Halle,
Pres.
"Universal Oil Products Company,
"a Delaware corporation
"By [Signed] Jno. J. Mitchell,
Vice Pres.
"Attest: [Signed] Macauley Carter, Asst.
Secretary.
"Attest: [Signed] W. M. Behrens, Secretary."

(Italics supplied.)

In considering the agreement of January 1, 1932, the above language that "operative words, expressing at least an intention to assign, in order to constitute an assignment," are most significant.

It is important to recall the purpose of the parties, who have the same officers and directors, in making the agreement. It was deemed impossible for Delaware in January, 1932, to take over the business and property of South Dakota in its entirety. Accordingly, there was specifically reserved to South Dakota all of its patents as well as its right to damages for infringement thereof. There was a specific covenant to subsequently assign the patents. It is clear that it was not the intention of the parties that the ownership of patents should be transferred in praesenti to Delaware.

Defendant contends that the parties put a practical construction upon the agreement and that everything but the "mere naked legal title" to the patents was transferred to Delaware. A practical construction of the agreement from the conduct of the parties leads to an opposite conclusion. It is apparent from Halle's first affidavit in the Kansas suit that this contention is unsound. In that affidavit he said: "As the owner of the various patents, Universal of South Dakota has commenced certain suits for infringement," etc. That the parties to the instrument did not treat it as an assignment appears from what they did. They proceeded on the theory that the agreement of January 1, 1932, did not affect the title of South Dakota to the patents and that the change in this situation did not occur until the assignments of January 14, 1936, were executed and delivered.

The terms of the agreement of January, 1932, negative an assignment. The agreement expressly negatives a present transfer of the patents. It excepts from what is to be sold and transferred to Delaware—

"(a) all Letters Patent issued by the United States of America or any other government or political division thereof and all pending applications for Letters Patent owned or controlled by the Old Company at the date hereof, (b) all the Old Company's right, title and interest in, to and under suits instituted by it for damages sustained by reason of infringement of any of its Letters Patent by whatsoever government issued, and all its right, title and interest in and to any and all claims or causes of action or accrued rights of action for past damages and profits including any and all causes of action for infringement of any of its patents, (c) all its right, title and interest in, to and under patent interference or annulment, revocation and opposition proceedings in the United States or elsewhere, (d) all existing license agreements under which the Old Company has granted rights in respect of Letters Patent owned by it * * *."

The above language manifests a clear intention not to part with the legal interest in the patents and does not purport to convey any present interest therein. In paragraph 4 of the agreement there is contained a covenant to subsequently transfer the patents which reads: "The Old Company hereby agrees that as soon as it shall have obtained the several consents of all of the Present Licensees to the transfer and assignment of their respective License Agreements to the New Company, it will, at the request of the New Company, assign, transfer, convey and deliver to the New Company all Letters Patent and reissues thereof issued by the United States of America or any other government or political division thereof, all pending applications for Letters Patent * * *."

South Dakota reserved not only the existing patents and all rights to recovery for infringement thereof, and all existing license agreements in respect to the patents, but also the right to grant in the future such licenses "as it shall be obligated to grant by the terms of any of its license agreements with its present licensees." An instrument cannot be construed as an assignment of a patent which in terms reserves to the assignor the title to the patents, the right to sue for infringements and to retain the proceeds of suits, the right to grant certain licenses, and specifically provides for the transfer of the patents upon the happening of a contingency in the future. All that Delaware had before the assignment of January 14, 1936, was an inchoate right to the patents in suit and a right to grant future licenses. The power to institute suits to enjoin infringements was expressly reserved to and remained exclusively in South Dakota.

The agreement of January 1, 1932, does not purport to give to Delaware the right to make, use, and sell, but only "the sole and exclusive right and power to grant future licenses," with reservation that South Dakota shall have the right to grant licenses when obligated to do so by the terms of any of its existing agreements. Defendants say that the exclusive right to grant licenses is tantamount to a grant to

Delaware to make, use, and sell because it may grant itself a license. But this would be manifestly contrary to the intention of the parties. The clear purport of the agreement and the reason for creating Delaware was that Delaware was eventually to take over the business of South Dakota which Halle's first affidavit in the Kansas suit stated to be "the granting of licenses under patents." Delaware, in reality, merely received a license to license.

Since the legal title to the patents and the right to prosecute suits for infringement at all times remained in South Dakota, the suits did not abate.

A decree in conformity with this opinion may be submitted.