734

PATENT DEVELOPERS, Inc., et al. v.
GEAR GRINDING MACH. CO.
et al.

No. 7533.

District Court, E. D. Michigan, S. D.
Dec. 19, 1936.

Barthel, Flanders & Barthel, of Detroit, Mich. (W. B. Kerkam and G. W. Daisley, both of Washington, D. C., of counsel), for plaintiffs.

Whittemore, Hulbert & Belknap, of Detroit, Mich. (Clarence B. Zewadski, of Detroit, Mich., and D. A. Usina, of New York City, of counsel), for defendants.

TUTTLE, District Judge.

This is a suit for infringement of letters patent Nos. 1,897,153, dated February 14, 1933, and 2,047,088, dated July 7, 1936, issued on applications filed by Ray Thornton. Claims 5, 8, 9, and 10 of the first patent, and claims 4–12, inclusive, of the second patent, are in suit. The plaintiffs are Patent Developers, Inc., owner of the legal title and to whom the patents issued, and Thornton Tandem Company, exclusive licensee; the defendants are the Gear Grinding Machine Company and Noble C. Banks. The plaintiffs as well as the corporate defendant are corporations organized and existing under the laws of Michigan. The defendant Banks is the president of the corporate defendant and is sued in his individual capacity.

The motion by defendants to dismiss as to Banks is denied because Banks willfully and deliberately initiated, controlled, and directed all of the wrongful acts of the corporate defendant constituting infringement of the patents in suit and in aggravation of that infringement. Denominational Envelope Co. v.

Duplex Envelope Co., Inc., 80 F.(2d) 186 (C.C.A.4).

The invention of patent No. 1,897,153 is a new combination in six wheel vehicles and resides in the provision of two rear driving axles closely spaced in tandem relation and driven through short driving connections from an auxiliary transmission positioned between the two driving axles and carried by the frame or sprung part of the vehicle. Power is supplied to the auxiliary transmission from the engine and main transmission by means of the usual propeller shaft. The two driving axles are so connected to the vehicle frame through springs as to provide a "walking beam" effect, which secures a decreased elevation of the vehicle body with respect to the elevation of the wheels in going over obstructions and the like. As shown in the patent, the springs are pivotally mounted between their ends on trunnions carried by the vehicle frame, one end of each spring being secured to one axle housing and the other end to the other axle housing. Although two parallel springs are shown on each side of the vehicle, any system in which the axles are so connected to the frame as to obtain the benefit of the walking beam effect meets the requirements of the inventive combination. The patent discloses other details of construction and some of the claims thereof are unnecessarily limited in their language to these other details, but I find that the essence of Thornton's contribution to the art resides in the few elements above recited and in their association together in the manner described.

From this basic combination of patent No. 1,897,153 flow new results of great practical importance. An extended and careful consideration of the prior art clearly reveals the novelty of this combination and its broad, fundamental, and pioneer characteristics. The power, load-carrying capacity, sturdiness, life, and economies involved in the use of trucks embodying this invention not only impress me from my own practical experience but also, as shown by the record in this case, won instantaneous recognition from every person who has come into contact with the invention, including the practical men associated with both plaintiffs and defendants and the people of and around Sebewaing, Mich., who were the first to become familiar with the Thornton invention and of whom Dr. J. E. Wurm, a practical and highly intelligent automobile dealer, and Martin List, a banker, testified with respect to Thornton's first embodiment in a truck in 1930.

It appears that various efforts had been made prior to Thornton to solve the problem of a simple, cheap, and efficient combination involving two rear driving axles, particularly for the ready conversion of light trucks of the Chevrolet and Ford type into six wheel trucks; but none of these earlier efforts made any impress on the practical art and each of them lacked one or more of the features of this new combination, all of which are necessary to a fulfillment of the functions to be subserved and the results to be secured.

I think so well of this combination that I shall give claims 8, 9, and 10 in suit of patent No. 1,897,153 the most liberal interpretation, if interpretation be necessary, for a pioneer invention of a new combination and arrangement of elements that develops new functions and results of the greatest benefit to the art. Indeed, my appreciation of this pioneer patent No. 1,897,153 leads me to hold claims 4–12 of Thornton's improvement patent No. 2,047,088 noninventive as representing mere mechanical skill over the disclosures of the first patent No. 1,897,153. In so holding, I am not unmindful of the fact that the applications for the two patents were copending, that Thornton was the inventor of both, that the improvements of patent No. 2,047,088 were part of Thornton's same inventive development, and that the particular disclosure of the second patent is the form appropriated by the defendants and which they copied in detail.

The great merits of the first patent No. 1,897,153 are such that the owners thereof should not be hampered by any so-called improvement patents from embodying the invention thereof in the very best form possible. The owner of a pioneer patent should not have to deal with inventors of alleged improvement patents which have been issued by the Patent Office, and who may clothe his inventive concept in a more acceptable commercial form. He should be free from any such harassment which too often is the fate of the owner of a patent on a broad and fundamental invention. It shall be my effort to so shield such a patent and its owner.

A consideration of the disclosures of the patents in suit will make my meaning and intent clearer.

In the pioneer patent No. 1,897,153 the rigid cross member which houses the auxiliary transmission is shown as an integral member, whereas in patent No. 2,047,088 the rigid cross member is shown as made up of two members to be bolted together and divided along a vertical line and having a readily detachable connection with brackets carried by the frame. This broad invention is not to be hampered by any such details of construction, it being immaterial whether the rigid member is composed of one or more sections, immaterial whether the sections are divided vertically or horizontally, and immaterial how they are mounted on or affixed to the sprung part of the vehicle. I therefore hold claims 4, 5, and 6 of patent No. 2,047,088 invalid as representing mere mechanical skill over patent No. 1,897,153 in view of the teachings of the prior art.

In the first patent No. 1,897,153 the auxiliary transmission between the two rear driving axles embodies sprockets and chains, whereas in patent No. 2,047,088 the auxiliary transmission embodies meshing gears. I hold that meshing gears are the mechanical equivalent of the sprockets and chains and a noninventive variation. Many of the claims of this first patent specifically require sprockets and chains, though claims 8, 9, and 10 do not. But, even if they did, I should have no hesitation in holding them infringed by a combination involving meshing gears. In view of the fact, however, that claim 5 in suit requires sprockets and chains I shall hold it noninfringed by defendants' meshing gear construction because of the broad language of claims 8, 9, and 10. These claims are broad enough to cover any auxiliary power transmission in the new combination of elements whether the transmission embodies a single, double, triple, or other reduction or speed ratio and whether the power is transmitted by chains or sprockets, meshing gears or the like.

In the first patent No. 1,897,153 there is no inter-axle differential shown or described, whereas in the improvement patent No. 2,047,088 one such is shown meshed with the output end of the gearing in the auxiliary transmission and in driving connection with the differentials in the two rear axles. I am not unmindful of the desirability of such an inter-axle differential in preventing tire and axle fight; but there seems to be a pro and a con in connection with this feature as the record shows that many users prefer to omit the inter-axle differential. The presence of this inter-axle differential is disadvantageous if one wheel is slipping, for under this condition the problem of traction becomes acute. I therefore hold that the addition of an inter-axle differential is noninventive over patent No. 1,897,153 and in view of the teachings of the art.

In the first patent No. 1,897,153 the ends of the springs are shackled to members fixed on the axle housings and the universally jointed driving connections between the auxiliary transmission and axle differentials are of a fixed length. In the improvement patent No. 2,047,088 the ends of the springs are pinned to bracket members loosely mounted on the axle housings and the universally jointed driving connections between the auxiliary transmission and the axle differentials are extensible by a telescopic engagement between the axle pinion shafts and the universal joint elements. The housings around these universally jointed extensible driving connections are also correspondingly extensible. It appears that the latter is the preferred construction; indeed, there are substantial advantages that inhere in it. With the shackled connections of the first patent—and by shackled connection I mean any of various types of connection that provide a yield or looseness between the springs and members fixed to the axle housings—and the nonextensible form of connections between the auxiliary transmission and the two rear axles, the drive from the tires to the vehicle body is of the torque tube type inasmuch as movement is imparted to the frame through the nonextensible driving connections. In the construction of patent No. 2,047,088 in which the springs are pinned to members loose on the axle housings and the universally jointed connections between the auxiliary transmission and the axles are extensible, the drive is through the springs and is thus of the so-called Hotchkiss type. Further, I am not unmindful of the fact that in the structure of the improvement patent No. 2,047,088 the extensible housings for the extensible driving connections act not only as covers or housings to protect the parts, but also as torque tubes to take the torque

reactions of the axles. In addition, they function in the presence of side thrust to shield the springs and spring trunnions; and they enable the axles to move toward and away from the auxiliary transmission. These are substantial advantages; but I find all of them to be embraced within the concept of the first patent No. 1,897,153. In the structure of the improvement patent practically all of the effects of side thrust are transmitted to the frame through the driving connections and their housings, whereas in the structure of the first patent, due to the presence of the shackle connections, about 90 per cent. of the side thrust was thus transmitted to the frame. The beauty of the fundamental combination of the first patent is that it lends itself so readily to all of these various improvements which are disclosed in the second patent.

I think so well of this first broad Thornton patent No. 1,897,153 that I give to it all that I take away from the improvement patent No. 2,047,088. I have in mind that some day these two patents may be independently owned, and it would be too bad if the owner of the pioneer patent No. 1,897,153 should have to deal with the owner of the improvement patent No. 2,047,088 for the right to use a better commercial form.

With this recognition of the multiple functions and advantages of the extensible connections between the auxiliary transmission and the axles of improvement patent No. 2,047,088, of the inter-axle differential, and of the particular form of rigid cross member carrying the auxiliary transmission, I hold that claims 4-12, inclusive, of improvement patent No. 2,047,088 are invalid as a noninventive contribution over patent No. 1,897,153, and as representing mere mechanical skill in view of the teachings of the prior art. However, I also hold that, if any of these claims of patent No. 2,047,088 are valid, or if defendants are estopped to deny their validity, they have been clearly infringed by defendants' devices.

In considering this broad and fundamental invention of patent No. 1,897,153 with respect to the prior art, I think of it as a living creature in which the several elements co-operate to perform its manifold functions and secure the new results. In its simplicity it is distinctive; and it is amazing, as it always is in the contemplation of such a highly useful and novel device, that this natural co-operative combination of elements was not sooner produced in view of the demand for such a device.

Among the advantages and results obtained by the basic combination of this first Thornton patent, it may be noted that there are some that are common to the prior art; but the complete fulfillment of all remained for this patent in suit. The positioning of the auxiliary transmission between the two rear driving axles enables the use of short, powerful driving connections to the axle differentials. The provision of a suspension system of the walking beam type insures the stable carrying of the load, whether fragile or heavy, because the body of the vehicle is elevated only half the distance of the wheels in going over irregularities and obstructions; and this feature with the universally jointed driving connections insures a maximum independency of movement of wheels and axles. Mounting the auxiliary transmission on the frame or sprung part of the vehicle insures a minimum of unsprung weight and this minimizes road shock and impact to the auxiliary transmission. Another important advantage and result resides in the manner in which the forces due to side thrust, whether originating at the road or from the load being carried, are transmitted to the frame through the driving connections. I am convinced that the demonstration of plaintiffs' expert Wolf establishes the accuracy of plaintiffs' contention that the combination and co-operative action of the several elements thereof acts to shield the springs and spring trunnions from the major portion of the stresses due to side thrust and thus minimizes wear and materially lengthens the life of the units embodying the invention. I think that is one of the big things and advantages of this invention; for no driver ever drove so straight and no pavement was ever so level that you were not continuously, with a heavy load, getting that side thrust from your load, every turn you made and every bump you took. Any one who has watched a heavy load move away will know that the load is continuously wrenching from side to side as it goes its way. This invention takes care of that condition in fine shape. Defendants' witness Ward testified that one of the infringing units would outlive two trucks; and I am convinced that the manner in which the forces due to side thrust are

transmitted to the frame plays a large part in this important result. The concept of utilizing stock parts in the combination is also important. The extra driving axle is a stock axle and the positioning of the auxiliary transmission between the two driving axles whereby the last gear reduction is adjacent the driving axles permits the stock propeller shaft running rearwardly from the main transmission to be employed. Further, the nice carrying of the load, the great power, the sturdiness and strength, and the large economies in first cost, maintenance, and operation are impressive new results that follow from the use of this invention. Cadillac Motor Car Co. v. Austin, 225 F. 983 (C.C. A.6).

No one before Thornton did all of this in a single structure so far as this record shows. The British patent to Deakin, No. 189,397, has, it is true, an auxiliary transmission carried by the sprung part of the vehicle; but it lacks a spring system whereby the walking beam effect is secured. If Thornton's combination is a living creature, the Deakin device may be said to be without feet. Deakin failed to conceive as did Thornton of a structure in which the driving connections and the walking beam type of spring suspension could be combined, and so failed to solve these problems of side thrust. It may be additionally noted that defendants' expert admitted that this Deakin structure as illustrated and described was inoperative unless changed in various ways; and it was also argued that the law with respect to such disclosures in a foreign reference does not countenance the modifications suggested by defendants' expert to make the device operative. I regard these considerations as immaterial and dispose of this Deakin patent on the factual ground that it fails to disclose the Thornton combination by which the new results are secured, which to me is more important than that there was no showing by defendants that the Deakin device had ever been practically used, that it appeared to be a so-called paper patent, and that changes would be necessary to make it practically operative.

The patent to Fageol, No. 1,739,355, shows a walking beam type of spring suspension, but it lacks an auxiliary transmission and, of course, the short powerful driving connections to the axles. The heart is missing, although the feet are there.

The patent to Kocher, No. 1,459,026, shows an auxiliary transmission for a four wheel drive; but it shows nothing else of the Thornton combination. It is a heart without body. The patent to Lacey, No. 1,522,783, does not have rigid axles. Each wheel is mounted on a stub shaft and driven from a frame supported differential through a shaft equipped with two universal joints—his legs are broken.

The Suhl patent, No. 1,288,271, issued in 1918, was probably the basis of Thornton's conception. It was directed to the idea of converting a four wheel truck to a six wheel truck; but Suhl did not have the walking beam combination and, while he had an auxiliary transmission, he carried it on the unsprung part so that road shocks and impacts were increased to a maximum. The outline of the body is there, but the heart is in the wrong place, and the feet are missing. His construction presented different problems. There was no showing on the trial that the Suhl device had ever been manufactured or sold. This is significant in that the corporate defendant here purchased the Suhl patent nine months before it expired, but did not use it and continued to use this Thornton invention in the devices which it manufactured and sold.

The patent to Winther, No. 1,351,084, relates to a four wheel drive vehicle— that is, a vehicle driving on the front steering axle as well as on the rear axle. It lacks the walking beam type of spring suspension, and the short powerful drivers —like Deakin, Winther is without feet. His problem was different, and it is clear that he never performed the functions or secured the new results that are secured with the Thornton invention. The British patent to Austin, No. 305,340, is even less pertinent than the British patent to Deakin because his auxiliary transmission is carried by the axles themselves and is hence unsprung weight—another misplaced heart.

The Chevrolet Repair Manual simply shows a universally jointed, extensible connection at the main transmission end of the propeller shaft of the conventional Chevrolet four wheel passenger automobile. The problems, conditions of use, and results secured are entirely different from those of the Thornton combination. In comparison with the living creature of the Thornton combination, it might be

said of the Chevrolet disclosure that it has arms but neither feet nor body.

There were many patents discussed as anticipations and many more to show the state of the art; but the foregoing are the closest that defendants produced and they fail to meet the test of good anticipations. None of them taught the solution as did Thornton. As I look at all of this prior art and at this patent No. 1,897,-153 I am impressed with the fact that here is something new and simple and the best looking rig I have seen. Nobody before Thornton ever made a combination like that; and, as I said before, it is strange that this is so, for it seems the simplest thing in the world to rig it up this way to make the best rig—and yet they had not done it. Somebody else may make a better combination some day, but I think that this is the best one up to date that anybody has made. And, as I have said before, everybody recognized this fact —the Sebewaing people, the men who organized the plaintiffs' companies, and these defendants.

Further, it has a good history in being accepted by the public. The reason why plaintiffs have not manufactured and sold more of them is fully explained in the record; but substantial numbers of them have been manufactured and sold by both plaintiffs and defendants. It is a worth-while invention and a worth-while patent and the best one I have seen lately—a fundamental, pioneer, workable thing composed of a few simple elements. This patent No. 1,897,153 should be very liberally treated, and every person who uses that combination without authority will infringe it regardless of the modifications he may make in the several elements—the auxiliary transmission and the means for connecting it to the frame or sprung part, the driving connections whether extensible or not, and the walking beam suspension system for the tandem driving axles.

There was much testimony in this case with respect to universal joints of the conventional Cardan or yoke type and the constant velocity type, one species of the latter type being manufactured by these defendants. It is clear to me that this combination has nothing to do with any particular type of universal joint. The contention of defendants that their particular type of constant velocity joint was necessary to make such a device a commercial success was not supported by them,

and I find as a fact that this contention is wholly lacking in merit; as also is defendants' contention with respect to inoperativeness of the structure shown in patent No. 1,897,153.

There is no doubt as to the infringement. Defendants have practically copied the structure of the second patent in suit which includes all of the essential elements of the inventive combination of the first patent. Infringement is clear.

. I accordingly find with respect to patent No. 1,897,153 that claim 5, which specifically requires sprockets and chains, is valid, but is not infringed by defendants' meshing gear construction; and that claims 8, 9, and 10 are valid and infringed.

With respect to patent No. 2,047,088 I hold that claims 4–12, inclusive, while clearly readable on defendants' structure, are invalid as noninventive over patent No. 1,897,153 and as representing mere mechanical skill in view of the teachings of the art. In holding these claims of patent No. 2,047,088 invalid, I have in mind the contention of plaintiffs that defendants are estopped to deny the validity of that patent and the claim of defendants that they have a license under that patent. My holding of invalidity of those claims makes these contentions of plaintiffs and defendants moot; but as some other court may disagree with my conclusions, I shall set forth the facts with respect to this phase of the case.

Thus far I have proceeded with respect to this matter of validity and infringement as though it were the usual patent case. Now I come to the facts that relate to plaintiffs' claim of defendants' estoppel as to patent No. 2,047,088 and defendants' claim of license under that improvement patent.

The record shows that Thornton had built the particular sprocket and chain device illustrated in patent No. 1,897,153 in 1930 in the garage of Dr. J. E. Wurm in Sebewaing; and that, after impressive demonstrations with that crude pioneer combination in Sebewaing, he drove the truck to Detroit where he changed over to a meshing gear construction. That was before he met anybody connected with either plaintiffs or defendants. Then in June, 1931, he met Slater, the present vice president of plaintiff Thornton Tandem Company, and later Baker, now president of the Thornton Tandem Company, and in August, 1931, a partnership

arrangement was entered into by these three men for the purpose of manufacturing and selling devices embodying the Thornton invention. The partnership, which was also known as the Thornton Tandem Company, was succeeded by, and transferred all of its assets to, plaintiff Thornton Tandem Company in January, 1932. In August, 1931, Thornton also assigned to Baker and Slater each a one-quarter interest in the invention of application Serial No. 508,322 "and improvements thereon," this being the application on which patent No. 1,897,153 issued on February 14, 1933. In October, 1931, plaintiff Patent Developers, Inc., was incorporated and Thornton, Baker, and Slater, together with one Smith who had acquired an interest in the invention by assignments from Baker and Slater, assigned all of their interest in the invention of that first application and improvements thereon to Patent Developers, Inc., and secured stock therefor. The assignments from Thornton to Baker and Slater and from the four individuals to Patent Developers, Inc., were duly recorded in the Patent Office, the former on September 8, 1931, and the latter on December 12, 1931.

The units which it was proposed to manufacture required universal joints, gears, shafts, and the like; and in the latter part of 1931 defendant company, that manufactured such parts, was solicited to submit bids. A number of these bids are in evidence, some addressed to Thornton Tandem Company and others to Patent Developers, Inc. The men associated with plaintiffs were poor and times were hard so that progress was slow.

In December, 1931, the truck that had been originally built in Wurm's garage and rebuilt in Detroit was demonstrated to defendant Banks. He was a practical man and as president of the corporate defendant had had considerable experience with six wheel trucks. It also appears from the record that he was, or claimed to be, fully informed regarding the prior art as the result of extensive investigation. Accordingly, he was in a position to appreciate this fine device and his recognition of its merits appears to have been instantaneous. So much so that on January 11, 1932, he wrote or authorized the writing of a letter to Patent Developers, Inc., requesting a license to manufacture and sell units embodying this Thornton invention at a royalty rate of 2 per cent. of the wholesale cost which would be about $10 per unit as appears from Baker's letter to Banks of January 28, 1932. This request for a license was considered by Patent Developers, Inc., and on January 15, 1932, was accepted by a letter to defendants written by plaintiffs' attorney Ferris. On January 18, 1932, at a meeting between Baker, Slater, and Banks, the latter recovered this letter of January 11, 1932, by a subterfuge and then stated that the deal was off. Banks admitted that he later destroyed this letter.

In the meantime and during the night of January 15, 16, 1932, Ray Thornton, then president of both Patent Developers, Inc., and Thornton Tandem Company, surreptitiously removed from the plant of those companies their drawings, castings, blueprints, and original demonstration truck and took them to defendants' plant. I am satisfied that Banks knew of this appropriation of plaintiffs' property at the time. Plaintiffs did not learn where their stolen property had been taken until January 28, 1932. At about this same time, Thornton entered the employment of defendants though nominally still president of both plaintiffs. He helped defendants start on their infringing operations.

When plaintiffs learned where their property had been taken, their attorney Ferris, and also Baker and Slater, wrote to Banks and the Gear Grinding Company during January, 1932, demanding the return of this property, and Baker in his letter of January 28, 1932, specifically stated that Patent Developers, Inc., owned the Thornton applications and inventions. These demands continued for many months. The record is full of these letters. Much of the property was returned. Some of the drawings were never returned.

The application on which the improvement patent No. 2,047,088 issued was filed on January 22, 1932, it having been prepared and filed at the expense of plaintiff Patent Developers, Inc. This company was clearly the owner thereof by virtue of the assignment to it of the invention of application Serial No. 508,322 "and improvements thereon"; for this second application covers a manifest improve-

ment on the combination of the first application through, as I hold, a noninventive improvement.

On February 8, 1932, Banks persuaded Thornton to assign this improvement application to the corporate defendant. Banks admitted that he knew Thornton had a corporate principal, and this he could hardly deny in view of the letters that he wrote Patent Developers, Inc., in the latter part of 1931 regarding quotations. He also on February 8, 1932, had notice by the assignment records of the Patent Office of the title of Patent Developers, Inc., to this application; and he had specific, definite, and direct notice by the Ferris, Baker, and Slater letters written to him in January, 1932. He elected to believe the alleged statements of Thornton to him that none of these people or concerns had any interest in or title to this second application; and thus took an assignment from Thornton of something that he knew Thornton had no right or title to assign. This is fraud under the doctrine of National Cash Register Co. v. New Columbus Watch Co., 129 F. 114 (C.C.A.6). Later, in September, 1932, when Banks had obtained from Thornton all that he desired, Thornton resigned from the employ of defendants, leaving with them a so-called license to manufacture and sell units embodying the improvements of this second application. There is no pretense or claim by defendants that the plaintiffs herein ever assented to any such license, but quite the contrary; and there is no claim by defendants that they ever secured a license from anybody under the first broad patent No. 1,897,153. When Thornton left defendants' employ, the second application was reassigned to him by defendants. It clearly appears that Thornton had no authority or title to issue a license to defendants.

In December, 1932, prior to the issuance of either of the two Thornton patents, plaintiffs instituted a suit in the state court of Michigan against these defendants and Thornton, seeking the return of the balance of its property. The illness of their attorney Ferris, who had been carrying on the litigation on minimum payments, and the indisposition of Ferris' partners to continue with the litigation unless they were paid, made it necessary for plaintiffs to dismiss the state court suit. The dismissal as to Thornton was in February, 1933, and as to defendants in May, 1933. A settlement agreement between plaintiffs and Thornton, dated February 3, 1933, is claimed by defendants, under the doctrine of joint tort-feasors, to release defendants from their acts prior to that date. I hold that Thornton and defendants were not joint tort-feasors; but, even if they were, the settlement that plaintiffs made with Thornton certainly had no effect as a license to defendants to infringe patents that issued after February 3, 1933—and it is noted that patent No. 1,897,153 issued February 14, 1933.

In July, 1933, defendants continued their oppressive operations against plaintiffs by instituting a suit for alleged patent infringement in this court on two patents, one to Ward, No. 1,271,495, for a method of grinding splines, and the other to Whisler, No. 1,294,583, for a specific improvement in universal joints. I am satisfied from the testimony of Banks and from a consideration of these two patents that the suit was a pretense and that Banks, who dictated the proceedings, knew that plaintiffs had never employed the method of the Ward patent or used any universal joint employing the details covered by the claims of the Whisler patent.

In August, 1933, plaintiff Thornton Tandem Company, being badly in need of funds, applied to the Michigan Securities Commission for validation of a stock issue. Defendants in some way learned of that application and, on September 18, 1933, Banks wrote to the commission in a successful effort to prevent the validation of the stock issue. That letter to the commission has to be read to appreciate the lengths to which these defendants were willing to go in their harassments of plaintiffs, always with the single idea of monopolizing the market for vehicles embodying this fine invention. Among other things, defendants advised the commission in this letter of the institution by them of the patent infringement suit, and this resulted in the refusal of the commission to validate the stock issue of the Thornton Tandem Company until that suit had been disposed of. It was kept pending by defendants until early the following year, when, after an unsuccessful effort by defendants to secure a license under patent No. 1,897,153, the suit was dismissed.

On September 23, 1933, five days after defendants' letter to the Michigan Securities Commission, defendant Banks went to the Patent Office in Washington and using an "associate" power which was dated September 2, 1932, more than a year earlier, inspected the secret application file of the second Thornton application, now issued as patent No. 2,047,088. This was more than a year after the application had been reassigned by defendants to Thornton and seven months after Thornton had assigned the application to Patent Developers, Inc. The "associate" power had been secured by Banks from defendants' attorney who had replaced plaintiffs' attorneys; and Banks admitted holding the same for its exercise at such time in the future as it might be desirable to know the condition of the second application. With the knowledge, that he thus unlawfully and improperly obtained, that all of the claims of the second application were then rejected, he solicited another conference with Baker and Slater which was held on Thanksgiving Day, 1933, when he again strove to intimidate them into a complete surrender to defendants in exchange for a distributorship of the infringing product on the Pacific Coast.

In November, 1934; plaintiffs were able to interest A. F. Knoblock, of Detroit, in their venture, and Mr. Knoblock furnished the necessary capital to enable plaintiffs to proceed in spite of defendants' unfair and unscrupulous business tactics.

In evaluating the great merits of the first Thornton patent, No. 1,897,153, I have kept these facts out of my mind. I have proceeded in the patent infringement case as though the defendants were innocent and not willful, deliberate, and malicious infringers, which they clearly are. Inasmuch, however, as the validity of the improvement patent No. 2,047,088 and the estoppel on defendants with respect thereto may subsequently arise, I make these findings.

I find against Banks on all issues of fact in dispute between him and others.

I find that Banks destroyed the letter from defendants to plaintiff of January 11, 1932, and mutilated the alleged license from Thornton to defendants of September, 1932.

I find that his acts are the acts of the corporate defendant and that he controlled and dominated the latter and determined what should be done by or on behalf of it at every stage of the proceedings involved in this case. From December, 1931, when he first saw this Thornton invention and appreciated its merits, to January, 1934, when he made his last effort to secure a license under patent No. 1,897,153, he conducted for the corporate defendant a campaign against plaintiffs of obstruction, intimidation, oppression, and slander in his efforts to get this fine invention.

This opinion may stand as a statement of the findings of fact and conclusions of law required by Equity Rule No 70½, 28 U.S.C.A. following section 723.